T. W. HOUSE v. F. SODER.

1. In 1863, so far as this court is apprised, there was no law or public policy of the United States, and no proclamation of the President of the United States, prohibiting the hauling of cotton from one portion of Texas to another, nor interdicting one citizen of the State from contracting to do such hauling for another ; and it is immaterial that the destination of the cotton was the port of Brownsville, on the Rio Grande.

2. If, in 1863, the owner of cotton, intending to evade the blockade and revenue laws of the United States, forwarded it to Brownsville by a common carrier, and it was there taken from the carrier by the authorities of the United States, the fraudulent intent of the owner, and the consequent loss of his cotton, cannot exonerate him from the carrier's claim for freight money.

3. In 1863, S., under contract with H., hauled the latter's cotton from Alleyton, Texas, to Brownsville, Texas, but on arriving at Brownsville was unable to find the consignee of H., and the cotton was taken from him by the authorities of the United States. Suit for his freight-money being brought by S. against H., the latter pleaded illegality of their contract, and also reconvened for the value of the cotton on the ground of the liability of S. as a common carrier. *Held*, that the contract was not illegal so far as S. was concerned. And *held further*, that even treating S. as a common carrier, his responsibility as such ceased, and his freight-money became due, when he arrived at the place of consignment and could find no consignee there. Thenceforth his liability could be no greater than that of a bailee, bound for only ordinary care and diligence ; and his failure to deliver the cotton was imputable, not to him, but to the owner, who therefore is still liable for the freight-money, and has no claim against S. for the value of the cotton.

APPEAL from Harris. Tried below before the Hon. James Masterson.

The opinion sufficiently indicates the facts.

*W. P. Hamblin,* for the appellant. Counsel for appellant insists :

*First.* That the demurrer should have been sustained, and urges the following points to sustain his views of the law :

The court judicially knows that the town of Brownsville, on the Rio Grande, was a port of entry in the District of Brazos Santiago. The town of Alleyton is alleged to be in the State of Texas, the inhabitants of which State, the court also judicially knows, were declared in a state of insurrection and rebellion against the United States ; therefore any contract to carry cotton from Alleyton to Brownsville at the time set forth in the petition, was inhibited, by the laws of the United States, and by the proclamation of the President of the United States, in full operation at the time the contract is alleged to have been executed and until the alleged fulfillment.

On the 19th of April, 1861, President Lincoln declared the ports of Texas in a state of blockade. (See United States Statutes at Large from Dec. 5th, 1859, to March 3d, 1863, Vol. XII., Appendix, pp. 1258 and 1259.)

The object of blockade was well understood to have for its objects the prevention of trade between the insurgents and all others, and to deny the means of ingress or egress of property that might be used in aid of the rebellion. There was no limitation of its effects to such as endeavored to communicate through the port with the inhabitants of the rebellious States, but all acts of the insurgents between themselves, which contemplated the use of the blockaded port for purpose of traffic, came within the purview of the proclamation, and were liable to its terms of forfeiture whenever the United States could assert their lawful authority. Any contract, therefore, that contemplated the delivery, in any manner, of cotton at Brownsville, was not only contrary to positive law, but also to the policy of the rightful government.

Furthermore, the Mexican States are judicially known to be on the opposite side of the Rio Grande from Brownsville, and the presumption would not be a violent one, that cotton con-

tracted to be carried to that point was intended for unlawful traffic with the citizens of a foreign government, thereby not only violating the law of blockade, but also the laws made to protect the revenue of the government.

One of the first acts of the government of the United States at the breaking out of the rebellion, was to provide for the collection of the revenues and to secure the customs, the lawful property of the United States. (See " An Act entitled an Act " further to provide for the collection of duties on imports and " for other purposes," July 16th, 1861, and amendment thereto of July 31st, 1861. United States Statutes at Large, Vol. XII., pp. 257 and 284, and proclamation of President Lincoln, April 2d, 1863.)

The case at bar is one falling within the operation of the proclamation and law above cited, and it was clearly illegal for parties to contract as shown by the pleading, and the courts will not lend their aid in enforcing such contracts.

By act of Congress, July 1st, 1862, Section 75, Statutes at Large, Vol. XII., p. 465, a tax on cotton is levied and a lien is declared on the cotton to secure the tax, payable wherever the cotton might be, unless the Commissioner of Internal Revenue should prescribe a place where the tax was payable. Now it is certainly within the knowledge of the court that at the date of the alleged contract the United States were unable to collect a tax within the limits of Texas, because by proclamation of the President, Texas was declared to be in a state of rebellion. Therefore, any cotton removed must have been removed without payment of the tax, and the act of removing was *prima facie* unlawful. Can a person claim payment for doing an unlawful act ? Certainly not. The question seems to be settled in case of Coppell *v.* Hall, 7 Wallace, p. 542, and cases there cited.

The first time that the State of Texas, or any portion, was subject to lawful authority after hostilities had begun, was when the port of Brownsville was declared open for commerce. This was in 1864, Feb. 18th. (See proclamation of President

Lincoln, Feb. 18th, 1864, U. S. Statutes at Large from 1863 to 1864, Appendix, p. 10.)

Prior to this time, from 1861, no act of traffic or commerce by insurgents or persons within the rebellious States, to or within the town of Brownsville, or any contract contemplating such traffic or commerce, was valid under the laws and proclamations above cited, and particularly so if cotton was the subject of such traffic or commerce.

*Stewart & Barziza*, for the appellee.

OGDEN, J.　The decisive question presented in the record of this case is in regard to the legality or illegality of the contract sued on.　In 1863 the appellee contracted to haul for appellant a certain quantity of cotton, at a stipulated price, from Alleyton, Texas, to Brownsville, Texas, and there deliver the same to appellant's agent or consignee.　The cotton was hauled to Brownsville according to contract, but that place about that time falling into the Federal possession, the agent or consignee of appellant could not be found, to receive the cotton, which was subsequently seized and taken from the possession of appellee by the Federal authorities.　Appellee brought this suit in the County Court of Harris county to recover the freight-money which he claimed to be due him on the contract for hauling, and obtained a judgment for the same.　The cause was appealed to the District Court, where a judgment was again rendered for the plaintiff below, and the defendant has appealed to this court.

It is now claimed that this contract was made during the late war, was in violation of the laws of the United States, and against the public policy of the country, and was therefore null and void.

We are not aware of any law of the United States, or of any proclamation of the President thereof, existing at the time this contract was entered into and performed by appellee, which prohibited the hauling of cotton from one portion of Texas to

another, or which prohibited the citizens of Texas from making any contract in regard to their municipal or domestic affairs which they might consider for their mutual benefit.    It is quite clear that appellant had cotton to be transported, and that appellee wished employment in hauling, and, so far as he was concerned, it was immaterial whether he hauled in one direction or the other, or to one place or another; his chief and only object was to obtain employment and get the price of his labor; and as there was no law to prohibit such a contract, he had the right thus to contract, and now has the right to demand and receive pay for his performance.

If the appellant intended to violate the laws and public policy of the United States, by evading the revenue laws, and by running the blockade with the cotton hauled by appellee, he might have been held responsible if caught in the attempt, and under the circumstances the Federal forces were fully justified in the seizure of the cotton, upon the presumption that such was his object and purpose. But, certainly, he should not be permitted to plead his own fraudulent intent as an excuse for the non-payment of his employee, who had no connection with, or interest in that fraudulent intent, if, indeed, he had any knowledge of that intent.

We are therefore of the opinion that the contract for freightage between appellant and appellee, as set out in the pleadings in this case, has no such fraudulent, illegal, or treasonable taint, as would deprive appellee of the right of having the same enforced in the courts of justice.

But it is claimed that appellee contracted as a common carrier, and as he failed to deliver the cotton according to the terms of the contract, he not only has no claim for freight, but has made himself liable for the value of the cotton. In the case of Chevallier v. Strahan, 2 Texas, 115, Chief Justice Hemphill, in delivering the opinion of the court, reviewed to some extent the authorities on the subject of common and private carriers, and the responsibility of each, and lays down the doctrine that

all persons who transport goods for hire for such persons as see fit to employ them, are common carriers, and incur all their responsibility; and yet, he says, that a common carrier is not responsible for the acts of God, the enemies of the country, or the fault of the party complaining, and he cites many authorities in support of this rule.

Let us, then, apply this doctrine to the facts of the case at bar. The carrier received the cotton at Alleyton, and conveyed it to the city of Brownsville, in everything fully complying with his contract; but when he arrived at the point of destination, he could find no consignee or other agent to receive the cotton for the owner or consignor, and he was unable to make a delivery, not from any fault of his, but from the default of the shipper in not having some person there to receive his property.

The duties and responsibilities of the common carrier ceased on his search and failure to find some person authorized to receive the cotton, after his arrival at the place of destination; and though he might be bound to hold or stow the same for the benefit of the owner, yet he would no longer be liable as a common carrier, but as a simple bailee, and bound to only ordinary care and diligence. His contract as a carrier had, so far as he was concerned, been fully performed, and his freight-money became due; and had he held the cotton longer, he would have been entitled to extra compensation as bailee; and if, while holding the cotton as such bailee, the Federal authorities seized the same, without any fault of his, he could not be held responsible for any loss which might accrue to the owner.

We are of the opinion that there was no error in the rulings of the court in giving or refusing the charges as set out in the transcript, and that the judgment is in harmony with justice and equity; and the same is affirmed.

Affirmed.