HANOVER NAT. BANK OF CITY OF NEW YORK v. FIRST NAT. BANK OF BURLINGAME, KAN.

(Circuit Court of Appeals, Eighth Circuit. May 6, 1901.)

No. 1,487.

1. NATIONAL BANKS—PRESIDENT'S POWER TO PROCURE DISCOUNTS.
   The president of a national bank, who has the actual management of its operations, is authorized to procure the discount of its paper.
2. NATIONAL BANKS—POWER TO CONTRACT ORALLY.
   A national bank may make a binding oral agreement to repay money it borrows, and to pay notes it procures to be discounted.

3. ILLEGAL CONTRACT NOT ENFORCEABLE.

An action cannot be maintained on a contract that is illegal or against public policy, where both parties are equally culpable.

4. CONTRACT ENFORCEABLE THOUGH AIDING VIOLATOR OF LAW.

A contract in whose consideration and performance nothing illegal or against public policy inheres may be enforced although it may incidentally aid one in evading or violating a law.

5. AVOIDANCE OF CONTRACT NOT PENALTY FOR VIOLATION OF A STATUTE UNLESS PRESCRIBED THEREIN.

Where a statute commands certain parties to do, or prohibits them from doing, certain acts, and prescribes the penalties for their violation of its commands, courts may not inflict other penalties for its violation upon other parties not named in the law by the avoidance of their contracts.

6. ACTION ON CONTRACT EXECUTED BY PLAINTIFF—INTENTION OF DEFENDANT TO VIOLATE LAW NO DEFENSE.

One who has received the benefits of the performance by the plaintiff of a contract which was neither malum in se nor malum prohibitum cannot successfully defend an action for the payment of his indebtedness arising therefrom on the ground that he intended to do some illegal act, which was neither a part of the consideration or of the performance of the agreement.

Caldwell, Circuit Judge, dissenting.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Kansas.

Edwin A. Austin and F. F. Prigg (C. M. Williams and C. N. Sterry, on the brief), for plaintiff in error.

Elijah Robinson and J. T. Pringle, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. The Hanover National Bank of the City of New York, the plaintiff in error, discounted the note of C. M. Sheldon for $5,000, due December 24, 1890, and paid the proceeds of this discount to the defendant in error, the First National Bank of Burlingame, Kan. When that note fell due, Sheldon failed to pay it, and the New York bank charged it up against the Kansas bank, but the latter refused to allow or pay any part of this charge, and insisted that the note had been discounted for Sheldon, and not for it. In this way the issue arose whether this note for $5,000 was discounted for Sheldon or for the Kansas bank, and when this case came to trial that issue was properly presented by the pleadings. At the close of the plaintiff's evidence the court instructed the jury to return a verdict for the defendant, and the only question for consideration here is whether or not there was any evidence which would have sustained a verdict for the plaintiff.

The defendant admitted in its answer that it received from the plaintiff the proceeds of the discount of the Sheldon note, but alleged that it immediately turned them over to Sheldon pursuant to an understanding between the plaintiff and Sheldon. At the former trial of this case, which was reviewed by this court in First Nat. Bank of Burlingame v. Hanover Nat. Bank of New York, 13 C. C. A. 313, 66 Fed. 34, there was evidence that the Kansas bank placed the proceeds of the note to the credit of Sheldon, and that he used them; but no

such evidence was introduced at the trial now under consideration. There was no proof of the averments of the answer in this respect, but the defendant left the proceeds where the plaintiff's evidence placed them, in the Kansas bank, and there was no evidence that Sheldon ever received the possession or use of one dollar of them. These were the facts of which there was evidence at the trial we are now reviewing: Sheldon was the president of the Kansas bank, and managed and controlled its operations. For all business purposes he was the bank. In the first part of September, 1889, he called upon the cashier of the New York bank, and negotiated with him for the discounting of promissory notes for the Kansas bank. In this interview he said that he did not want to put the name of the Kansas bank on the notes it wished to have discounted, because he did not wish to state the bank's indebtedness on account of these notes in the reports to the comptroller of the bank's financial condition, but that his bank would transfer its New York account from the Chemical National Bank to the plaintiff, and would authorize the latter to charge these notes to its account as they matured, and, in addition to this security, Sheldon would sign or indorse the notes individually before they were discounted. The New York bank accepted this proposition. It agreed to discount for the Kansas bank notes signed or indorsed by Sheldon individually, and the Kansas bank agreed to authorize the New York bank to charge these notes to its account as they matured. The officers of the New York bank never had any conversation with Sheldon about discounting notes or loaning money to him individually. Immediately after this agreement was made, and pursuant thereto, the New York bank, on September 6, 1889, discounted for the Kansas bank a note for $2,500 made by J. A. Finch & Co., and indorsed by Sheldon without the indorsement of the Kansas bank. This note was subsequently twice renewed, and it was finally paid by the Kansas bank. On October 10, 1889, a note of the East Kansas Loan & Investment Company for $11,663.35, but without the indorsement of the Kansas bank, was discounted for the latter, and the proceeds paid to it in the same way. On February 24, 1890, a note of the same company for $4,828.32, indorsed by Sheldon, but without the indorsement of the Kansas bank, was discounted, and the proceeds were paid over in the same way. All these notes were charged to the Kansas bank, and were paid by it without objection. On September 23, 1890, Sheldon's note for $5,000, in controversy in this case, was discounted by the New York bank, and its proceeds were paid over to the Kansas bank in the same way. The first reference to this discount in the correspondence from Kansas is in a telegram of September 8, 1890, concerning the bank's matters, which reads:

"Hanover National Bank, New York: What about five thousand discount? Can you take it? Answer. Charge up twenty-five hundred due tenth. Answer. C. M. Sheldon, Pt."

The second reference to it in that correspondence is in a letter of September 11, 1890, signed in the same way. The third communication from Kansas concerning it is dated September 20, 1890, and requests the cashier of the New York bank to "place proceeds to our

credit," if he can use it, and is signed "C. M. Sheldon." The correspondence from Kansas is signed indifferently "C. M. Sheldon" and "C. M. Sheldon, Pt.," but refers alike to bank matters. The answer to this letter of September 20, 1890, was:

"New York, Sept. 23rd, 1890.

"C. M. Sheldon, Prest., Burlingame, Kansas: Letter twentieth received. Note credited your account.                                    Jas. T. Woodward, Prest."

—And the proceeds of the note were on that day credited to the Kansas bank, and not to Sheldon. There is much more testimony in this record, but enough has been recited to show that there was ample evidence here to warrant a finding by a jury that Sheldon's note was discounted for the Kansas bank, and not for him, under the agreement of September 6, 1889. This issue must be examined and determined in the light of the prior transactions and the course of business between the banks and in view of the fact that the New York bank had the right to rely upon these, and, in the absence of notice to the contrary, to presume that the same course of action was continuing. The Kansas bank had the right to borrow money, and to procure a discount of its notes. It had the same right to borrow money and to procure a discount of its notes upon its oral as upon its written promise, and its oral agreement to pay the notes it procured to be discounted when they matured, together with the fact that it received their proceeds, charged it with as conclusive a legal liability as its promissory note or its indorsement would have created. Sheldon was the president and the actual manager of the bank. He had ample authority from it, by virtue of his official position, to borrow money, to procure a discount of its notes, to agree on its behalf to repay the money borrowed, and to contract on its behalf to pay the discounted notes as they matured. Auten v. Bank, 174 U. S. 125, 149, 19 Sup. Ct. 628, 43 L. Ed. 920; United States Nat. Bank v. First Nat. Bank of Little Rock, 24 C. C. A. 597, 600, 79 Fed. 296, 299, 49 U. S. App. 67, 72; Bank v. Smith, 23 C. C. A. 80, 77 Fed. 129, 135; Fleckner v. Bank, 8 Wheat. 338, 360, 5 L. Ed. 631; Wild v. Bank, 3 Mason, 505, Fed. Cas. No. 17,646; Bank v. Perkins, 29 N. Y. 554, 569, 86 Am. Dec. 332; Cooke v. Bank, 52 N. Y. 96, 114, 115, 11 Am. Rep. 667; Bank v. Wheeler, 21 Ind. 90; Merchants' Bank v. State Bank, 10 Wall. 604, 650, 19 L. Ed. 1008. There was evidence in this case for the consideration of the jury which tended to prove that the Sheldon note was discounted for the Kansas bank, and that that bank agreed with the plaintiff that it would pay it at its maturity.

It is said that the agreement was not that the New York bank might charge the discounted notes to the Kansas bank as they matured, but that in the case of each discount the Kansas bank would give such authority, and that, while it did so in every other instance, it failed to do so in the case of the Sheldon note, because the authority is signed by C. M. Sheldon individually. The correspondence clearly indicates that Sheldon's individual signature was often made when he was acting and writing for the bank. Whether or not this was true in this particular instance is not material, because an agreement to authorize a charge of a note to be discounted

constitutes as effective a creation of a liability to pay it after it has been discounted as the actual grant of the authority.

Another contention of counsel for the bank is that the contract between the two banks is incapable of enforcement, because Sheldon informed the New York bank that the reason why he wanted to make the agreement without putting the indorsement of the defendant on the paper was that he did not wish to report to the comptroller and to publish the fact that his bank had procured these rediscounts. It is insisted that this statement of Sheldon when the contract was made injected into it a fatal vice, because it brought home to the New York bank knowledge of the fact that the contract might assist Sheldon in evading or violating the provisions of section 5211 of the Revised Statutes, which requires the presentation to the comptroller of the currency, and the publication of the reports of the resources and liabilities of a national bank. But there are several reasons why this position is not tenable. In the first place, the argument is founded on the principle that an action cannot be maintained on a contract that is illegal or against public policy, in which both parties are equally culpable. Bartle v. Coleman, 4 Pet. 184, 7 L. Ed. 825; Trist v. Child, 21 Wall. 441, 22 L. Ed. 623; Marshall v. Railroad Co., 16 How. 314, 14 L. Ed. 953; Hinnen v. Newman, 35 Kan. 709, 12 Pac. 144. But this rule has no application to an agreement which has no consideration, and which requires the performance of no act that is either illegal or against public policy; and that is the character of the contract here in issue. Neither the intention of Sheldon not to report the rediscounts nor his statement of that intention constitutes any part of the consideration of this agreement. The only consideration for the advances of the New York bank was the discounts and the interest it would obtain, while, on the other hand, the only consideration for the promise of the Kansas bank was the use of the money it would secure, and the excess of discounts and interest it would earn above those that it would pay. The intent or purpose of Sheldon could not have been a part of the consideration of the agreement, because neither he nor the Kansas bank promised to accomplish that purpose, and there is no evidence that it ever was accomplished. It was at most a mere collateral, incidental, unaccomplished purpose, and could constitute no bar to the enforcement of the agreement. The mere fact that a contract the consideration and performance of which are lawful incidentally assists one in evading a law is no bar to its enforcement. Green. Pub. Pol. p. 538, rule 464; House v. Soder, 36 Tex. 629; Gerhard v. Neese, Id. 635; Jefferson v. Burhans, 29 C. C. A. 481, 85 Fed. 949, 58 U. S. App. 586, 593, 595.

Another reason why the statement and intention of Sheldon to violate the provision of the national banking act to which reference has been made constitutes no defense to an action upon this contract is that the penalties for such a violation are prescribed by that act, and an avoidance of the unreported legal liabilities of the bank is not among them. If Sheldon had accomplished his purpose, if he had actually failed to report these rediscounts, the performance of this contract might, nevertheless, have been compelled. Sections

5213 and 5209 of the Revised Statutes prescribe penalties of fines and imprisonment for a failure to make a true report of the resources and liabilities of a bank. But the acts of congress nowhere declare that the contracts on which those resources and liabilities are based shall become either void or unenforceable on account of such failure. Where a statute commands certain parties to do certain acts, and prescribes the penalties for their violation of its command, it is not the province of the courts to inflict other penalties upon innocent parties not named in the law on account of such a violation. End. Interp. St. § 458; Speer v. Board, 32 C. C. A. 101, 110, 88 Fed. 749, 758, 60 U. S. App. 38, 53; Bank v. Whitney, 103 U. S. 99, 102, 26 L. Ed. 443; Bank v. Matthews, 98 U. S. 621, 627, 25 L. Ed. 188; Bank v. Stewart, 107 U. S. 676, 2 Sup. Ct. 778, 27 L. Ed. 592; Gold-Mining Co. v. Rocky Mountain Nat. Bank, 96 U. S. 640, 642, 24 L. Ed. 648; O'Hare v. Bank, 77 Pa. 96, 102; Weber v. Bank, 12 C. C. A. 93, 64 Fed. 208, 210; Westheimer v. Weisman, 60 Kan. 753, 756, 57 Pac. 969; Town of Milford v. Town of Worcester, 7 Mass. 48; Parton v. Hervey, 1 Gray, 119; Rex v. Inhabitants of Birmingham, 8 Barn. & C. 29. Where a statute imposes a penalty on an officer for solemnizing a marriage under certain circumstances, but does not declare the marriage void, it is valid, but the penalty attaches to the officer who performed the prohibited ceremony. Town of Milford v. Town of Worcester, 7 Mass. 48. Section 5136 of the Revised Statutes impliedly forbids a national bank to loan money upon real-estate security. But a mortgage upon real estate given to a bank to secure a contemporaneous loan or future advances is valid between the parties, and may be enforced. Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188; Bank v. Whitney, 103 U. S. 99, 26 L. Ed. 443. Section 5201 expressly prohibits a loan by a national bank upon a pledge of its own shares. But such a pledge was enforced in Bank v. Stewart, 107 U. S. 676, 2 Sup. Ct. 778, 27 L. Ed. 592. Section 5200 forbids any bank to loan to one person or firm an amount in excess of one-tenth of its actually paid capital stock. But it is no defense to an action for the recovery of money loaned by a bank that the amount of the loan exceeded the limit prescribed by this section. Gold-Mining Co. v. Rocky Mountain Nat. Bank, 96 U. S. 640, 24 L. Ed. 648; O'Hare v. Bank, 77 Pa. 96; Pangborn v. Westlake, 36 Iowa, 546. Section 5202 provides that no national bank shall "be indebted or in any way liable to an amount exceeding the amount of its capital stock * * * paid in * * * except on" circulation, deposits, special funds, or declared dividends. But it is no defense to an action for a debt of the bank that its indebtedness exceeded the limitation fixed by this provision of the banking act. Weber v. Bank, 12 C. C. A. 93, 64 Fed. 208.

Finally, the contract upon which this action is founded was neither wrong in itself nor was it forbidden by statute. There was no moral turpitude in it, and there was nothing prohibited by law or by public policy either in its consideration or in its performance. The proposed omission of Sheldon to report and publish the rediscounts was not evil in itself. It was wrong only because the statute had directed that a true report should be made and published.

In the absence of such a statutory provision, it was as right morally to fail to make and publish as it was to make and publish such a statement. The evidence tends to prove that the New York bank has performed its part of the agreement; that it has discounted the Sheldon note, and paid its proceeds to the Kansas bank. No rule of morals or of law occurs to us which requires a court to permit this defendant to retain all the benefits of this agreement, to repudiate its burdens, and to violate the law which requires it to pay its just debts, simply because its president once had an intention to violate another law. One who has received the benefits of the complete performance by the plaintiff of a contract which was neither malum in se nor malum prohibitum cannot successfully defend an action for the payment of his indebtedness which has accrued therefrom on the ground that either he or another intended to do some unlawful act which was no part of the consideration nor of the performance of the agreement. Armstrong v. Toler, 11 Wheat. 258, 272, 278, 6 L. Ed. 468; McBlair v. Gibbes, 17 How. 232, 235, 236, 15 L. Ed. 132; Brooks v. Martin, 2 Wall. 70, 81, 17 L. Ed. 732; Planters' Bank v. Union Bank, 83 U. S. 483, 500, 21 L. Ed. 473. The judgment below is reversed, and the case is remanded to the court below, with instructions to grant a new trial.

THAYER, Circuit Judge (concurring). There was ample testimony in this case to warrant a jury in finding that the Hanover National Bank placed the amount of the Sheldon note—i. e. the sum of $5,000—to the credit of the First National Bank of Burlingame, Kan., on its books, with the understanding that the money was obtained for the use of the latter bank, and not for the use of Sheldon, and upon the further understanding and agreement that when the note matured according to its terms the amount thereof might be charged against the account of the Kansas bank with the Hanover National Bank, as was in fact done when the paper matured. The evidence as respects the party to whom the loan was made, whether to Sheldon or to the First National Bank of Burlingame, Kan., of which he was the president, and the evidence as respects the agreement that the amount of the loan should be charged to the Kansas bank when it matured, was clearly of such a nature that these issues should have been submitted to the jury. And if the jury had found, in accordance with the contention of the plaintiff bank, that the loan was made to the Kansas bank, and not to Sheldon, then, so far as the plaintiff bank was concerned, the Kansas bank was the principal debtor, and Sheldon, who had executed his note for the loan, was merely a surety for its repayment.

It is said, however, that the action of the trial court in withdrawing the case from the jury may be sustained because the plaintiff bank was advised before it made the loan that the defendant bank did not intend to enter the loan on its books either in the form of rediscounted paper or as a part of its bills payable, and that, having knowledge of this fact when it made the loan, it should not be allowed to recover. It is to be observed, however, that the plaintiff bank neither directed, requested, nor stipulated that the loan, when

made, should be entered on the books of the defendant bank in any particular manner, or that no entry thereof should be made. The information in question was communicated to the plaintiff bank by Sheldon simply as an explanation of his desire to give his own note as an evidence of the debt, rather than the note of the defendant bank. The plaintiff bank was not advised that the borrower intended to make an unlawful use of the money which it desired to obtain; neither had it any power to prescribe the manner in which the borrower should make a record of the indebtedness on its own books. It follows, therefore, that the money in question was not loaned by the New York bank to the Kansas bank in consideration for the doing of any unlawful or immoral act by the latter bank, or in consideration of its promise to do any such act. The money was loaned solely in consequence of the defendant's promise to repay it, and this promise to repay, which the present action is brought to enforce, is not founded either in whole or in part upon an illegal or an immoral consideration. Such being the situation, no reason is perceived why the promise may not be enforced in a court of justice. Neither can it be said that by loaning the money under the circumstances aforesaid, which was an act in itself entirely lawful, the plaintiff bank became either an aider, abettor, or an accessory to any crime committed by any officer or officers of the defendant bank, since the latter were not the plaintiff's agents in making a record of the loan on the books of the defendant bank; nor were such officers bound to comply with any directions of the plaintiff with reference to the making of such an entry, even if such directions had been given. It was undoubtedly the duty of the officers of the defendant bank to make a proper record of the loan on its books of account, but, if they violated that duty, they did so of their own volition. The plaintiff bank did not request, direct, or stipulate that any false or misleading entry should be made. Under these circumstances there is no rule of law which, when properly applied, will prevent the plaintiff bank from recovering. It would be carrying the doctrine which is invoked by the defendant wholly too far to say that one who loans money to another cannot recover it if he receives an intimation at the time of making the loan that the borrower will perhaps make an unlawful use of the whole or a part of the sum borrowed, or that he will not make such an entry of the loan on his own books as he ought to make. It has been held that, where an illegal contract has been executed by the parties thereto, the money or thing which issued out of the illegal transaction, and is in the hands of one wrongdoer, may form a legal consideration between the parties for a promise, express or implied, to pay the same, or a part thereof, to the other, and that the court will not unravel the transaction to discover the origin of the fund. Planters' Bank v. Union Bank, 16 Wall. 483, 499, 500, 21 L. Ed. 473; Brooks v. Martin, 2 Wall. 70, 17 L. Ed. 732. If this be so, and if money which has been realized in an unlawful transaction may be recovered by one wrongdoer from another upon an implied promise, after the unlawful transaction has been consummated, I can perceive no sufficient reason for denying the plaintiff's right

to recover in the case at bar, although it did have knowledge that the defendant bank did not intend to make such an entry of the loan upon its books as it ought to have made. For these reasons I concur in the reversal of the judgment.

CALDWELL, Circuit Judge (dissenting). The court sustained a demurrer to the plaintiff's evidence, and directed the jury to return a verdict for the defendant, which was done. The note discounted by Sheldon was his own individual note. It was not payable to nor indorsed by the defendant bank. It was not the property of the defendant bank at any time, and its execution, existence, and discount were unknown to the bank, and wholly unauthorized by it. The note was the personal obligation of Sheldon, and discounted for his own personal use and benefit. These facts are overwhelmingly established by the plaintiff's own testimony and letters. We here quote a sample of the letters which refer to the note in suit:

"The Hanover National Bank of the City of New York.

"New York, December 15th, 1890.

"C. M. Sheldon, President, Burlingame, Kansas—Dear Sir: Referring to your personal note $5,000 due December 24th, our board insists that the First National Bank of Burlingame should guaranty it. We accordingly inclose form of guaranty for signature, and return, and remain,

"Yours, very truly,                Wm. Halls, Jr., Asst. Cashier."

No guaranty in writing or otherwise was ever given, but, on the contrary, as soon as the plaintiff bank made a claim against the defendant bank for the amount of the note, it promptly denied any liability therefor. There is not a syllable of evidence going to show that Sheldon had any authority to bind the bank in this transaction, if we except his alleged statements to the officers of the plaintiff bank, which are mere hearsay, and of which more hereafter. It is said the money was placed to the credit of the defendant bank, but the bank was a mere conduit through which it passed to C. M. Sheldon, who immediately drew it out on his personal checks, and for his personal use; and this fact is distinctly stated in the answer. This is the second appearance of this case in this court. When the case was here the first time, Judge Sanborn, delivering the unanimous judgment of the court, said:

"But the evidence was undisputed that the New York bank discounted this note on September 23, 1890; that by direction of Sheldon it placed the proceeds of it on its books to the credit of the Kansas bank, and telegraphed to Sheldon to that effect on the same day; and that immediately upon the receipt of that telegram by Sheldon these proceeds were placed to his credit in the Kansas bank, and were used by him. Just as soon as he learned that the New York bank had credited the Kansas bank with this money on its books, he caused it to be charged to the Kansas bank, and credited to himself on the books of the latter, and he used it. The Kansas bank neither retained nor enjoyed the proceeds of this discount, nor did it receive any interest, commission, or other benefit from the transaction." First Nat. Bank of Burlingame v. Hanover Nat. Bank of New York, 13 C. C. A. 313, 66 Fed. 34.

There is no evidence questioning or contradicting this finding of fact in the present record. The assistant cashier of the plaintiff bank, upon whose testimony the plaintiff relies for a recovery, re-

ferring to the discount of the note in controversy, says, "The First National Bank of Burlingame was to give us their authority to charge to their account at maturity," not that the authority had been or was given. If Sheldon had, or claimed to have, any such authority, why did the plaintiff bank not exact the guaranty at the time? If any such guaranty was then made, why write to Sheldon months afterwards, insisting that he should obtain the guaranty of the defendant bank for "your personal note $5,000, due December 24th"? Under the testimony it is not possible to maintain the claim that at the time the note was discounted it was then a liability of the defendant bank. On the contrary, it was then distinctly agreed between Sheldon and the plaintiff bank that the loan was made to Sheldon personally on his individual note and credit, and not to the bank, and that Sheldon alone, and not the defendant bank, was the borrower and the debtor in the transaction. This fact is conclusively established by the plaintiff's books and by the testimony of its assistant cashier, who states very fully the reason why the credit was given to Sheldon, and not to the bank. He says:

"Mr. Sheldon practically said that the demands for money in his section were at times greater than his bank's resources admitted of their supplying without rediscounting or borrowing. Now, they did not want to rediscount or borrow, and put it on the books in that way, because they would have to show the people that they were borrowers of money; and they wished to avoid this. * * * We demurred a little at that, but, as he was so urgent, and said it would only be for a moderate amount, and only for the emergencies of those times when his bank would be short, we agreed to do it in that way. Q. So you understood that Mr. Sheldon did not want to sign the name of the bank to this note, or indorse the notes in the name of the bank, because the people would find out that the bank was borrowing money? A. That is practically the idea. * * * I may also explain that the comptroller calls for reports from national banks at certain periods, and he did not wish to show in the newspaper publication of these reports that his bank was a borrower."

And again he says Sheldon said:

"The demand they had for money was greater than their resources would supply, and they did not like to have to publish in their statement, which they were called upon for from time to time by the comptroller of the currency, any bills rediscounted or bills payable, and Mr. Sheldon had devised the idea, which one or two other bank officers had also followed, of having paper discounted" in this way.

And, coming to the particular note in controversy, he says:

"In this particular instance the proposition was that the First National Bank of Burlingame was to give us their authority to charge to their account at maturity such notes as we had discounted in this way, and it was upon that proposition, with the correspondence we had had before, that the president and I passed the paper after our board of directors had referred it to us under the belief that it was for that bank."

When Sheldon urged that the loan be made to him, and not to the defendant bank, for the reasons he had stated, the plaintiff's assistant cashier says: "We demurred a little at that, but, as he was so urgent, and said it would only be for a moderate amount, and only for the emergencies of those times when his bank would be short, we agreed to do it in that way." "We agreed to do it in that way," —in what way? In the way Sheldon wanted it done, and that was that

his note should be discounted for him; the liability thereon should be his, and not the bank's. To have charged the defendant bank with the note would have frustrated the very purpose Sheldon had in view. He did not want to make it a liability of the bank, "because the people would find out that the bank was borrowing money." The plaintiff bank yielded to Sheldon's "urgent" appeal, and agreed to do it in that way, and discounted the note on Sheldon's personal credit, and its books, accounts, and letters show that fact, and confirm the testimony of its cashier. Obviously, if Sheldon, or any other officer of the bank, had been indicted under section 5209, Rev. St. U. S., for not including in the report of the bank's condition this note as a liability of the bank, as required by section 5211, he could not have been convicted. The note itself, the plaintiff's books, and the testimony of the plaintiff's cashier would have shown to a demonstration that it was Sheldon's personal debt, and not the debt of the bank. The nearest approach to connecting the defendant bank in any way with the transaction would have been the statement of the plaintiff's cashier that Sheldon said the bank would at some future time guaranty the payment of the note, which it never did. It is equally clear, upon the proof in this case, that, if the plaintiff bank had brought an action against Sheldon on this note, it must have recovered, and it is doubtless because of his insolvency that the plaintiff now seeks to convert his note into an obligation of the bank. Let it be noted that the plaintiff makes no claim that there was any mistake, oversight, or accident in the transaction, or that the note, and its books, accounts, and letters do not truly show the transaction as it actually took place. It rests its claim wholly on an alleged promise of Sheldon that the bank would at some future time guaranty the payment of his note. Having given the credit to Sheldon originally for the reason and purposes stated by its cashier, the plaintiff will not now be heard to set up a claim that the note was discounted for the bank, and is the bank's debt, and not Sheldon's. Manifestly, it was not the bank's debt when the note was discounted. It was expressly stipulated that it should not be, and confessedly nothing transpired afterwards to make it such. It is not doubted but what, if this issue had been submitted to the jury, their verdict would have been for the defendant. Upon this issue, however, if there had been no other, the case should have been submitted to the jury.

But there was another issue, and it is stated in the brief of counsel for the plaintiff in error that it was upon this latter issue that the lower court directed a verdict for the defendant. The plaintiff bank, perceiving that the note was Sheldon's individual paper, and not indorsed by the bank, and that its books and letters showed that the note was discounted for and charged to Sheldon personally, and not to the defendant bank, was driven to seek a recovery upon a contract, not only not disclosed by the writings, but flatly inconsistent with them. In doing so it has simply jumped out of the frying-pan into the fire. It now says that the transaction was made to appear to be one with Sheldon personally for the purpose of circumventing and evading the provisions of the national bank act.

Section 5211 of the Revised Statutes of the United States reads as follows:

"Every association shall make to the comptroller of the currency not less than five reports during each year, according to the form which may be prescribed by him, verified by the oath or affirmation of the president or cashier of such association, and attested by the signature of at least three of the directors. Each such report shall exhibit, in detail and under appropriate heads, the resources and liabilities of the association at the close of business on any past day by him specified; and shall be transmitted to the comptroller within five days after the receipt of a request or requisition therefor from him, and in the same form in which it is made to the comptroller shall be published in a newspaper published in the place where such association is established, or if there is no newspaper in the place, then in the one published nearest thereto in the same county, at the expense of the association; and such proof of publication shall be furnished as may be required by the comptroller. The comptroller shall also have power to call for special reports from any particular association whenever in his judgment the same are necessary in order to a full and complete knowledge of its condition."

Section 5209 of the same statutes declares:

"Every president, director, cashier, teller, clerk or agent of any association * * * who makes any false entry in any book, report or statement of the association with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association or any agent appointed to examine the affairs of any such association, * * * shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

The plaintiff's assistant cashier testified, as we have seen, that Sheldon desired to circumvent the requirements of the statute which we have quoted, and which makes it the duty of the officers of national banks to report, under oath, the liabilities of their banks, and publish the same in a newspaper published in the place where the bank is established, and to that end, the witness says, "Mr. Sheldon had devised the idea" described in detail by the witness whose testimony we have elsewhere set out. That "idea" was that, if the defendant bank then indorsed or guarantied the payment of the note, its officers would be compelled by the requirements of the statute quoted to report it as a liability of the bank to the comptroller of the currency, and to publish that report in a newspaper printed in the town where the bank was situated; and Sheldon said he did not want the bank officers compelled to do that, "because the people would find out the bank was borrowing money," and for this reason he wanted the plaintiff bank to discount the note upon his individual indorsement and credit, and that at some future time the bank would guaranty its payment; and the plaintiff's assistant cashier says, "We agreed to do it in that way;" and it is upon this agreement that the plaintiff bank now seeks to recover. It must be conceded that there is not a scintilla of evidence that the defendant bank ever did afterwards guaranty or otherwise do any act to render it liable for the note.

At this point it may be observed that, whatever implied powers a bank president has to borrow money for his bank, he has no implied power to borrow in the mode and for the reasons stated in the testimony of the plaintiff's cashier. National banks were brought into

being by an act of congress. They are federal corporations, and quasi public institutions. They were brought into existence at a critical period in the history of the country as a means of rendering financial aid to the government, and of providing the people with a sound currency, national in its character, and as a means of affording safe depositories for public and private moneys. To accomplish these extremely desirable objects, and for the security and protection of the public, the act creating these institutions exacts from their officers, under heavy penalties, a rigid observance of its requirements, and subjects these institutions to a large measure of governmental control and supervision. Among other requirements, the statute makes it the duty of every national bank to make, under oath, not less than five reports during each year to the comptroller of the currency, and as many more reports as that officer may require, showing the "resources and liabilities" of the bank; and these reports are required to be published in a newspaper published in the place where the bank is situated; and the act declares that any officer of the bank who makes any false report or statement shall be "imprisoned not less than five years nor more than ten." And as a means of ascertaining whether the officers of these associations are complying with the requirements of the law, and whether their reports state truly the resources and liabilities of their banks, the government stipulates for and exercises the power of visitation over them, and sends its officers, known as "bank examiners," to examine the condition of these banks when and as often as the comptroller of the currency deems necessary. It will be observed that the officers of national banks have duties to perform which are public in their nature, and which they are required to perform for the security and protection of the public, and for not performing which they are liable to a heavy penalty. To carry out Sheldon's idea, it was necessary for the plaintiff bank to become an active participant in the scheme to evade and violate the statute. The basis of the whole agreement now set up was the fraudulent concealment of a fact the law required to be reported to the comptroller of the currency, and published for the protection of the public. It was to be done so artfully that no bank examiner could ever discover the fraud. To accomplish this, it was absolutely essential that the plaintiff bank should assert, as it did, and make its books show, as it did, that the note was discounted for the account of Sheldon personally, and that there was no liability on the bank for the same. All this the plaintiff bank agreed to do and did do. A more shocking agreement was probably never entered into by a reputable financial institution. It involved a violation of the act of congress by the officers of both banks,—on the part of the plaintiff bank a false statement, in this: that it would report the sum of the note as due from Sheldon instead of the defendant bank; and on the part of the defendant bank a false statement of its liabilities. If Sheldon's note was then a liability of the defendant bank, as now claimed, then this agreement necessarily contemplated the commission of fraud and perjury, which the statute denounces and punishes as a crime. In view of this obvious fact, it is not surprising that, when Sheldon unfolded to the

109 F.—28

plaintiff bank this shocking scheme which he had devised to cheat the law and defraud the public, the plaintiff's cashier says, "We demurred a little at that;" but they did not stand on their demurrer, and their virtuous instincts soon gave way under the urgent plea of Sheldon, and he says, "We agreed to do it in that way." Here we have a distinct agreement amounting in law to a deliberate conspiracy between Sheldon and the plaintiff bank to violate the statute and defraud the public if the note was then a liability of the bank. In the face of these facts it is vain to talk about the plaintiff bank being an innocent party. It is said these facts constitute no defense to this action, because the penalties for the violation of the statute "are prescribed by that act, and an avoidance of the unreported legal liabilities of the bank is not among them." No one contends that, when a bank fails to report its debts, it is thereby discharged from them. But if one national bank, for the purpose of enabling another national bank to evade the provisions of the statute requiring it to make a true report to the comptroller of the currency of its liabilities, agrees to discount and does discount the individual note of the president of the latter bank without the indorsement or guaranty of the latter bank, the former bank will not thereafter be heard to set up a claim that the note is the obligation of the bank, and not the personal obligation of its maker, as it purports to be.

It is well settled that all contracts which have a tendency to corrupt persons holding any office or trust under a statute which imposes on them the performance of any act for the protection of the public are void as against public policy. The law will not permit one to encourage, aid, or assist another to be unfaithful in the discharge of a legal duty he owes to the public, and any contract or agreement having that for its purpose or having that tendency is void. Chicago, M. & St. P. R. Co. v. Wabash, St. L. & P. R. Co., 9 C. C. A. 659, 61 Fed. 993, and cases there cited. And when a statute makes the nonobservance of its requirements a crime, for which a penalty is imposed, a contract made to evade the statute, or to aid or abet its violation, or which has that tendency, is void, independently of any question of public policy other than that appearing from the statute itself. The doctrine rests on the impregnable principle that no one can come into a court of justice, and seek the assistance of the law, whose claim is founded on a contract or agreement made to evade or circumvent the law. In Bartlett v. Vinor, Carth. 252; Id., Skin. 322, Holt, C. J., said: "Every contract made for or about any matter or thing which is prohibited or made unlawful by any statute is a void contract, though the statute does not mention that it shall be so, but only inflicts a penalty on the offenders, because a penalty implies a prohibition, though there are no prohibitory words in the statute." Lord Mansfield, in Drury v. Defontaine, 1 Taunt. 136, referring to a case in which the contrary had been held, said, "The law has since changed, and, if any act is forbidden under a penalty, a contract to do it is now held void." And in Belding v. Pitkin, 2 Caines, 149, the court said: "It is too salutary and well-settled a principle to be in any measure infringed that courts of justice ought not to assist an illegal transaction in any respect. It is the first principle, and not to

be touched, that a contract, in order to be binding, must be lawful. Whenever the consideration which is the ground of the promise, or the promise which is the effect or consequence of the consideration, is unlawful, the whole contract is void."

The rule is now firmly established that, where a statute imposes a penalty to protect the public against fraud or imposition, or to protect the public health or morals, the imposition of the penalty amounts to a prohibition of acts in violation of it, and all contracts tending to that result are void. Statutes which prohibit worldly labor on the Lord's day, and impose penalties for their violation, never in terms declare that contracts made on that day shall be void. But the principle is well settled that all contracts made on that day, like all other contracts made in violation of a statute which inflicts a penalty for the prohibited act, are void. Swann v. Swann (C. C.) 21 Fed. 299, 306; 2 Pars. Cont. 886; Lyon v. Armstrong, 6 Vt. 219; Robeson v. French, 12 Metc. (Mass.) 24, 45 Am. Dec. 236; Gregg v. Wyman, 4 Cush. 322; Hazard v. Day, 14 Allen, 487. We forebear to cite the multiplied cases supporting the foregoing propositions. It is enough to cite and quote briefly from two comparatively recent decisions of the supreme court of the United States. In Gibbs v. Gas Co., 130 U. S. 396, 410, 9 Sup. Ct. 553, 32 L. Ed. 979, the supreme court, speaking by Mr. Chief Justice Fuller, said:

"The law 'cannot recognize as valid any undertaking to do what fundamental doctrine or legal rule directly forbids. Nor can it give effect to any agreement the making whereof was an act violating law. So that, in short, all stipulations to overturn—or in evasion of—what the law has established; all promises interfering with the workings of the machinery of the government in any of its departments, or obstructing its officers in their official acts, or corrupting them; all detrimental to the public order and public good, in such manner and degree as the decisions of the courts have defined; all made to promote what a statute has declared to be wrong,—are void.' Bish. Cont. § 549; Woodstock Iron Co. v. Richmond & D. Extension Co., 129 U. S. 643, 9 Sup. Ct. 402, 32 L. Ed. 819 (decided at this term), opinion by Mr. Justice Field; Trist v. Child, 21 Wall. 441, 22 L. Ed. 623; Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225; Arnot v. Coal Co., 68 N. Y. 558, 23 Am. Rep. 190; Salt Co. v. Guthrie, 35 Ohio St. 666; Woodruff v. Berry, 40 Ark. 251, 261; Hartford & N. H. R. Co. v. New York & N. H. R. Co., 3 Rob. (N. Y.) 411; Craft v. McConoughy, 79 Ill. 346, 22 Am. Rep. 171; Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Denio, 434; Railroad Co. v. Collins, 40 Ga. 582; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. 173."

In Miller v. Ammon, 145 U. S. 421, 426, 12 Sup. Ct. 884, 36 L. Ed. 759, that court, speaking by Mr. Justice Brewer, said:

"The general rule of law is that a contract made in violation of a statute is void, and that, when a plaintiff cannot establish his cause of action without relying upon an illegal contract, he cannot recover. Pol. Cont. pp. 253-260; Penn v. Bornman, 102 Ill. 523; Alexander v. O'Donnell, 12 Kan. 608; Gunter v. Leckey, 30 Ala. 591; Kennedy v. Cochrane, 65 Me. 594; Bank v. Owens, 2 Pet. 527, 539, 7 L. Ed. 508; Pangborn v. Westlake, 36 Iowa, 546, 549; Harris v. Runnels, 12 How. 79, 84, 13 L. Ed. 901. In Bank v. Owens, this court said, 'There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal.' There are some exceptions to this general rule, and the last two cases cited furnish instances thereof. These exceptions are based upon a supposed intent of the legislature. In Pangborn v. Westlake it was thus stated how the exception should be determined: 'We are, therefore, brought to the true test, which is that while, as a general rule, a penalty implies a prohibition, yet the

courts will always look to the language of the statute, the subject-matter of it, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment; and if, from all these, it is manifest that it was not intended to imply a prohibition, or to render the prohibited act void, the courts will so hold, and construe the statute accordingly.' And in Harris v. Runnels, this court, after noticing some fluctuations in the course of decision, and observing 'that we have concluded, before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty, or a penalty only for doing a thing which it forbids, that the statute must be examined as a whole, to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it should not be so,' added: 'It is true that a statute containing a prohibition and a penalty makes the act which it punishes unlawful, and the same may be implied from a penalty without a prohibition; but it does not follow that the unlawfulness of the act was meant by the legislature to avoid a contract made in contravention of it. When the statute is silent, and contains nothing from which the contrary can be properly inferred, a contract in contravention of it is void.' In the light of these authorities, the solution of the present question is not difficult. By the ordinance, a sale without a license is prohibited under penalty. There is in its language nothing which indicates an intent to limit its scope to the exaction of a penalty, or to grant that a sale may be lawful as between the parties, though unlawful as against its prohibitions. Nor, when we consider the subject-matter of the legislation, is there anything to justify a presumed intent on the part of the lawmakers to relieve the wrongdoer from the ordinary consequences of a forbidden act."

Upon the plaintiff's own testimony the court properly instructed a verdict for the defendant, and its judgment should be affirmed.