INGRAHAM v. NATIONAL SALT CO.

(Circuit Court of Appeals, Second Circuit. April 6, 1904.)

No. 152.

1. CORPORATIONS—VALIDITY OF CONTRACTS—IMPEACHMENT OF CERTIFICATES OF INDEBTEDNESS.

A corporation having charter power to purchase the stock of other corporations bought the stock of another corporation, and in part payment therefor issued stock of its own, both common and preferred, which was deposited in trust with the stock purchased. It also issued to the sellers, through the trust company, certificates of indebtedness, payable in semiannual installments for five years. The agreement also provided that all dividends declared on the stock of the purchasing company should be paid to the trust company and applied in payment of the certificates until their full payment, after which the stock was to be delivered and the trust terminated. Held, that such certificates were not ultra vires, having been issued for one of the purposes for which the corporation was organized, and in the exercise of its implied power to incur indebtedness for such purpose, and that the corporation could not assert their invalidity on the ground that they were in effect, and were intended to be, a guaranty to the holders of a fixed dividend on their stock for a term of five years.

2. CONTRACTS—LEGALITY—ANTI-TRUST LAW.

It is no objection to the enforcement of a contract, in the consideration and enforcement of which nothing illegal inheres, that it may incidentally aid one of the parties in evading or violating the anti-trust statute.

In Error to the Circuit Court of the United States for the Eastern District of New York.

See 122 Fed. 40.

Joseph A. Burr, for plaintiff in error.
H. B. Twombly, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

WALLACE, Circuit Judge. This is a writ of error by the plaintiff in the court below, brought to review a judgment for the defendant. The assignments of error challenge the rulings of the trial judge in withdrawing the case from the consideration of the jury and directing a verdict for the defendant.

The action was brought to recover the amount of 12 obligations, termed "certificates of indebtedness," created by the defendant, and countersigned and registered by the American Trust Company, evidencing the promise of the defendant to pay to the payee or order a

specified sum of money in certain equal semiannual installments. These certificates are substitutes for 12 purchased by the plaintiff in the spring of 1901, and which he surrendered to the American Trust Company for the purposes of registry, and were received by him in exchange for those surrendered.

The answer of the defendant is a voluminous document which is rather in the nature of a bill in equity than of any pleading known to a court of law. Two defenses can be spelled out of it. The first is that the certificates (the originals) are invalid because they were made as part of an agreement which the defendant was without corporate power to make, viz., as a cover for an agreement by the defendant to guaranty dividends upon certain shares of its preferred and common capital stock, and thereby give the holders of these shares an unauthorized preference over the other stockholders of the defendant. The second defense is that they were made on an illegal consideration, viz., to effect a scheme contravening the law of the state of Ohio declaring unlawful certain combinations in restraint of trade.

The action has been before this court upon a previous writ of error which was brought by the defendant in the court below to review a judgment for the plaintiff. The court was then of the opinion that the facts established the first defense, and that, although the plaintiff was a purchaser of the certificates for value, he took them subject to any infirmities which would have invalidated them in the hands of the original holders. We are satisfied that our decision was erroneous, and are glad to have an opportunity to correct it while the consequences are yet remediable.

Succinctly stated, the certificates originated as follows: The defendant, a New Jersey corporation organized to carry on the manufacture of salt, and having power, among other things, "to purchase, hold, sell, assign, mortgage, pledge, or otherwise dispose of, shares of the capital stock * * * of any corporation of the state of New Jersey or of any other state," decided to acquire the capital stock of the United Salt Company, a corporation of Ohio. Accordingly, in 1889, the defendant made an agreement with certain shareholders of the United Salt Company whereby they were to sell their shares to the defendant, and the defendant was to pay for each of their shares 1¼ shares of its preferred stock and 1¼ shares of its common stock, and also a money consideration of $106.25 in 10 equal semiannual installments. This money consideration was equivalent to annual dividends for five years upon each share and a quarter of preferred stock of 7 per cent. per share ($43.75), and upon each share and a quarter of common stock of 10 per cent. per share ($62.50). The agreement provided that all the shares to be exchanged, those of the United Salt Company as well as those of the National Salt Company, should be deposited with the American Trust Company until the money consideration should be fully paid; that in the meantime all dividends declared upon the preferred and common stock of the National Salt Company thus deposited should be paid by the defendant to the American Trust Company; that the dividends so paid should apply as payments pro tanto of the money

consideration; that the defendant should make its certificates of indebtedness for the money consideration, and the same should be issued by the American Trust Company to the stockholders of the United Salt Company, or their assignees, in the amount due to them respectively; and that when the certificates were fully paid the trust should terminate, and the deposited stock be delivered to its owners. It further provided that, in case of failure of the defendant to pay the certificates according to their terms, the American Trust Company should sell the deposited shares of the United Salt Company, apply the proceeds to the payment of the certificates, and pay any surplus to the defendant. Pursuant to the agreement, the shares to be exchanged were deposited with the trustee, and the certificates of indebtedness were made by the defendant and issued by the trustee. The agreement thus referred to consisted of several documents, some executed by the shareholders of the United Salt Company, some executed by the defendant, and some executed by the American Trust Company, and which were intended to embody together the complete agreement.

The contention of the defendant in respect to this agreement is found in that part of its answer which avers as follows:

"That, whereas said alleged agreements in writing provided for the cash payment of $106.25 per share for each share of the capital stock of the United Salt Company, and the issuing of certificates of indebtedness to the respective holders, in accordance with their holdings, to evidence the same, said provision for cash payment was in fact a mere subterfuge, and the real agreement was that the said the National Salt Company should make a guaranty of 7 per cent. upon the preferred stock and 10 per cent. upon the common stock, to the stockholders of the United Salt Company, upon the stock of the National Salt Company to be exchanged for the stock of the United Salt Company; that said guaranty extends over a period of five years, and until the sum of $106.25 per share has been paid; that thereby the stock which would be given by the National Salt Company to the stockholders of the United Salt Company was and is given a preference over and above the stock held by any of the other stockholders of said National Salt Company; that said guaranty of said dividends by the National Salt Company upon the stock exchanged by the stockholders of the United Salt Company was without power on the part of the said National Salt Company to make, and was therefore void and of no effect."

It will be observed that it is not contended by the defendant that the agreement was made without the consent of the majority of its stockholders, or without compliance in any other respect with the requisite formal proceedings to sanction the corporate act in making it. The defense rests solely upon the theory that the agreement was ultra vires.

It is plain that the agreement resulted in setting apart the deposited National Salt Company stock until the certificates should be paid, and denuding it in the meantime of the right to receive any dividends which might accrue upon it, and in appropriating such dividends to the payment of the certificates. The real question in the case is whether the agreement was ultra vires in the sense that it could not be made without the unanimous consent of the stockholders of the defendant. The only evidence of the intention of the parties to it is found in the agreement itself. Whether it was made as a cover or "subterfuge" for some other agreement

which would have been ultra vires is merely an academic question. If it was not ultra vires, it was one which the defendant could lawfully make, and the defendant's motive in making it could not affect the legal quality of the act. The doctrine that after the shares have been distributed, and the relations of corporation and stockholders have been fixed, the corporation cannot, in the absence of authority in its charter or articles of association, create shares which carry a preferred right to dividends, or a right to a fixed payment in lieu of dividends, without the unanimous consent of its stockholders, has been asserted by the authorities, and rests upon undoubted principle. The same principle would forbid the corporation to create a new class of stockholders having rights or privileges not common to all. The reason is that to permit this would impair the existing equality among the stockholders, and subvert the vested rights which every stockholder acquires upon the purchase of his shares. But these rights are not invaded by the exercise of any power which resides in the corporation by virtue of its charter or the law of its organization, because every stockholder assents in advance to the exercise of such powers. The stockholder also assents in advance to the exercise by the corporation of all the incidental powers necessary to carry into effect the express objects of its charter or articles of association, and these include all that are reasonable and adapted to the end in view. Thus, the power to borrow money is implied as incidental to the defined powers of ordinary private business corporations; and if, in order to borrow money, the corporation finds it expedient to create preferred stock, and the issue is not in excess of the authorized capitalization of the corporation, no stockholder has reason to complain. The adjudged cases have not always recognized the force of this original consent by stockholders to the exertion of the incidental powers of the corporation. In Kent v. Quicksilver Mining Company, 78 N. Y. 159, the court assumed that, if the preference stock had been created as an exertion of the incidental power of borrowing money, it would have been a valid act, notwithstanding the absence of unanimous consent by the stockholders. This proposition is consistent with good sense, because the power to borrow includes the authority to mortgage the corporate property as a security, in the absence of some restriction in the charter; and the creation of preferred shares in place of common shares is no more harmful to the rights and interests of existing stockholders than is the creation of a mortgage. 2 Redfield on Railways, § 237; Westchester R. Co. v. Jackson, 77 Pa. 321. If the defendant, in order to attain one of the authorized objects of its incorporation, the purchase of the shares of another corporation, had found it expedient to agree with the vendors that the shares of common stock which they were to receive in exchange should carry 10 per cent. annual dividends for five years, to be paid out of the general dividend fund before appropriating any of it to the payment of dividends upon the rest of the common stock, we are not prepared to say that the agreement would not have been valid, as to all the stockholders of the defendant, as an exercise of one of the incidental powers to which all had

originally consented. Such a contract would have been valid if it had been an act which was directly and immediately appropriate to the exercise of the specific power granted. For much learning upon this subject, the well-known case of Curtis v. Leavitt, 15 N. Y. 9, may be profitably consulted.

The present agreement did not have the effect of creating any new preferred stock or guarantying dividends upon the new stock. The stock to be transferred to the new holders was the existing preferred and common stock of the corporation, and the certificates were independent negotiable securities, which might or might not be transferred with the stock. If the new holders should remain the owners of the certificates, they would become creditors as well as stockholders of the defendant; if they should choose to dispose of the certificates and retain their stock, they would be stockholders on precisely the same footing as all the other preferred and common stockholders of the corporation. If they were willing to forego dividends for a longer or shorter period, that was no concern of the other stockholders. Certainly that feature of the agreement worked the latter no harm or wrong. The defendant was expressly authorized to purchase the stock of other corporations, and, as incidental to such a purchase, it had authority to contract to pay for the stock in such mode and upon such conditions as were deemed advantageous. It did agree to pay for the purchased stock, partly in its own stock and partly in money, and to issue its obligations for the payment of the money at such times as were mutually satisfactory to the vendors and itself. It doubtless expected that the dividends which would accrue upon its stock deposited with the trustee would meet these payments, and so did the vendors; but there was no agreement to that effect. The promise contained in the certificates may have been regarded by both as substantially equivalent to such an agreement; but, assuming this to be so, so long as it was not the agreement, and could not be enforced, it is quite immaterial what were the expectations which prompted it. It not infrequently happens that the same substantial results can be effected by proper means or by means which the law will not sanction. If the present case affords an instance, it is also one where the legitimate means were used. Because the defendant was careful not to make any contract which would be obnoxious to any of the rules of the law of corporations, it seeks to evade the contract by asserting that it was intended as a substitute for one which it could not properly make. This position is without any other merit than its consistency with the conduct of the defendant in skulking behind a factitious wrong to stockholders in order to repudiate the contract while it retains the fruits.

Whether the purchase by the defendant of the shares of the United Salt Company was made to effect a combination of the two corporations in order to prevent competition in the salt trade, and, if so, whether the stockholders of the Ohio corporation were participes criminis or merely actuated by the motive of selling their shares advantageously, are inquiries which need not be pursued. The evidence in the present record does not throw any light upon

them, the case having been decided in the court below in favor of the defendant, upon the first defense, conformably with the views which this court had expressed. It is proper, however, to observe that it is no objection to the enforcement of a contract, in the consideration and performance of which nothing illegal inheres, that it may incidentally aid one of the parties in evading or violating a statute. Hanover National Bank v. First National Bank, 109 Fed. 421, 48 C. C. A. 482.

The judgment is reversed.