[L. A. No. 146. Department One.—June 17, 1897.]

## ILLINOIS TRUST AND SAVINGS BANK, RESPONDENT, *v.* PACIFIC RAILWAY COMPANY, APPELLANT.

STREET RAILWAYS—GRANTS ULTRA VIRES—TRUST MORTGAGE AND BONDS BY GRANTEE—ADOPTION OF MORTGAGE BY GRANTOR — FORECLOSURE BY TRUSTEE—DEFICIENCY—JUDGMENT AGAINST GRANTEE—APPEAL BY GRANTEE—UNTENABLE OBJECTIONS.—Where a street railway company made an *ultra vires* grant of all of its property and franchises to another company, organized under the laws of another state, and the grantee agreed to assume all of the obligations of the grantor, and executed a trust mortgage to secure bonds issued by the grantee, and the grantor subsequently adopted the trust mortgage as its own, and agreed that its property should stand charged for the payment of such bonds, and, upon foreclosure of the mortgage against its property, took no appeal therefrom, but an appeal was taken by the company which issued the bonds from a judgment against it enforcing its obligation to pay any deficiency, the appellant cannot object upon such appeal that the contract of the other company adopting the trust mortgage as its own was *ultra vires*, nor that such other company was coerced to hypothecate its property to secure the bonds, and the judgment of foreclosure being conclusive that such hypothecation was not *ultra vires*, but valid and operative, the appellant cannot contest its validity, whether it consented to the contract or not, nor can it object to the foreclosure of the mortgage by the mortgagee in trust, nor urge that the only right of action against appellant is in the several holders of the bonds.

ID.—VALIDITY OF BONDS—POWER TO MORTGAGE IMMATERIAL.—The bonds were not rendered *ultra vires* or invalid, by reason of its being *ultra*

*vires* for the company issuing them to mortgage the property of the other company to secure them, it being within its power to borrow money and issue evidences of indebtedness, and its bonds were not affected by want of power to make the mortgage by which they were in terms secured.

Id.— Illegality of Transfer — Public Policy — Purpose of Bonds — Knowledge of Bondholders.—There is nothing criminal nor against good morals in an attempt *ultra vires* by one street railway company to acquire the property and franchises of another, which is forbidden by public policy, and the vice of illegality infects only the contract between the two corporations, and does not affect the validity of bonds issued to third persons by the grantee company, but such bonds constitute a series of transactions resting on a new consideration, and connected only indirectly with the contract between the corporations; and though the bondholders may have knowledge of the illegality of the transaction between the two companies and of the purposes of the grantee company to apply the proceeds of the sale to pay the debt of the grantor company, and to complete and extend its roads, yet having done nothing to promote those purposes beyond parting with their property on the faith of the bonds, their right of recovery is not thereby affected, not being founded on the illegal contract between the companies.

Id.—Pledge of Bonds of Corporation as Collateral Security—Constitutional Law.—The right of a corporation to pledge its bonds as collateral security is included in the right to sell them; and a constitutional provision that no railroad corporation shall issue stock or bonds except for money, labor, or other property actually received by the corporation, does not prevent such pledge, where money or other property is actually received by the corporation in consequence of such use of them.

Id.— Authority of President to Pledge Bonds — Acquiescence and Ratification.—It seems that, under proper circumstances, the authority of an agent to negotiate securities includes the right to pledge them; and where the president of a street railway corporation was authorized to negotiate its bonds, and his practice of pledging bonds extended over a considerable period, and the corporation received and expended the sums raised by such pledges without objection to the authority of the president to pledge them, until after suit was brought, and failed to object to such authority within a reasonable time after knowledge that a right of pledge was asserted by the pledgees, the corporation so acquiesced in and ratified the president's assumption of authority to pledge the bonds, that his agency to negotiate the bonds must be held to have extended to the hypothecation of them.

Id.—Notes Signed in Contravention of By-laws—Approval of Corporation.—The fact that notes signed in the name of the corporation by its president, were executed in contravention of its by-laws, is immaterial, where the corporation approved his action; and a corporation whose internal polity requires its contracts to be executed in a certain manner may, by acquiescence, become liable upon contracts made by its agents in some other manner.

ID.— AMOUNT OF RECOVERY — ERROR IN FAVOR OF APPELLANT.— Where the amount of recovery is less than the amount which appears to be due under the evidence, the error, being in favor of the appellant, is not ground of reversal.

ID.—NUMBER OF BONDS OUTSTANDING—PRIMA FACIE SHOWING—CUSTODY OF BONDS BY APPELLANT—BURDEN OF PROOF.—Where the evidence of the number of bonds outstanding was received without objection, and made a *prima facie* case, and where the appellant had received the custody of the bonds from the trustee, it devolved upon the appellant to rebut the *prima facie* showing and to prove its falsity.

ID.—SUBSTITUTION OF ENGRAVED FOR LITHOGRAPHED BONDS—DUPLICATES. Engraved bonds, substituted for lithographed bonds of corresponding numbers, are to be regarded as mere duplicates or reissues of the lithographed bonds for which they were exchanged.

APPEAL from an order of the Superior Court of Los Angeles County denying a new trial. WALTER VAN DYKE, Judge.

The facts are stated in the opinion.

*S. C. Hubbell, Bicknell & Trask,* and *J. S. Chapman,* for Appellant.

The transfer by the Los Angeles Cable Railway Company of its property and franchises to the Pacific Railway Company was void. (*People* v. *Duncan,* 41 Cal. 507; *Wood* v. *Truckee Turnpike Co.,* 24 Cal. 474; *Gregory* v. *Blanchard,* 98 Cal. 311, 313.) The Pacific Railway Company could not pledge its bonds as collateral security. (*Brewster* v. *Hartley,* 37 Cal. 15; 99 Am. Dec. 237; Const., art. XII, sec. 11; Ill. Const., art. XIII, sec. 13.)

*Edwin Walker, W. P. Gardiner,* and *Allen, Conrey & Miller,* for Respondent.

The personal judgment appealed from is valid as to the appellant, though all the transactions as to the securities were invalid. (Civ. Code, sec. 1599; *Granger* v. *Original Empire etc. Co.,* 59 Cal. 679, 682; *Philadelphia etc. Ry. Co.* v. *Lewis,* 33 Pa. St. 33; 75 Am. Dec. 574.) Knowledge by the bondholders of the alleged illegality of the contract between the two railroad companies would not invalidate the contract upon the bond or mortgage. (*Anheuser-Busch etc. Assn.* v. *Mason,* 44 Minn.

318; 20 Am. St. Rep. 580; *Brunswick* v. *Valleau,* 50 Iowa, 120; 32 Am. Rep. 119, note, 122; *Sondheim* v. *Gilbert,* 117 Ind. 71; 10 Am. St. Rep. 23; *Tracy* v. *Talmage,* 14 N. Y. 162; 67 Am. Dec. 132.) The cable company had power to execute a mortgage to secure its debts, which the Pacific Railway Company had assumed. (Civ. Code, sec. 450; *Low* v. *Central Pac.R. R. Co.,* 52 Cal. 53; 28 Am. Rep. 629; *Chicago etc. R. Co.* v. *Howard,* 7 Wall. 392.) The Pacific Railway Company is estopped from making its defenses herein. (Herman on Estoppel, secs. 1182, 1183; *Jones* v. *Guaranty etc. Co.,* 101 U. S. 622; *Peoria etc. R. R. Co.* v. *Thompson,* 103 Ill. 187; *Bradley* v. *Ballard,* 55 Ill. 413; 8 Am. Rep. 656; *Main* v. *Casserly,* 67 Cal. 127; *Pixley* v. *Western Pac. R. R. Co.,* 33 Cal. 183; 91 Am. Dec. 623; *San Francisco Gas Co.* v. *San Francisco,* 9 Cal. 472; *Ill. Pneumatic Gas Co.* v. *Berry,* 113 U. S. 322; 2 Morawetz on Private Corporations, sec. 632; *Wright* v. *Hughes,* 119 Ind. 324; 12 Am. St. Rep. 412; *Thomas* v. *West etc. R. R. Co.,* 101 U. S. 71; *American Union Tel. Co.* v. *Union Pac. R. R. Co.,* 1 McCrary, 188; *Memphis etc. R. Co.* v. *Dow,* 19 Fed. Rep. 388.) The action to foreclose the security was proper and necessary, without regard to the adequacy of the security. (Code Civ. Proc., sec. 726; *Barbieri* v. *Ramelli,* 84 Cal. 154.) A corporation may pledge its bonds. (*Nelson* v. *Hubbard,* 96 Ala. 238; *Lehman* v. *Tallassee Mfg. Co.,* 64 Ala. 567; *Duncomb* v. *New York etc. R. R. Co.,* 84 N. Y. 190; *Curtis* v. *Leavitt,* 15 N. Y. 9; Thompson on Corporations, sec. 6061; Jones on Pledges, sec. 13; *Sickles* v. *Richardson,* 23 Hun, 559, 565, 567.)

Britt, C.—Foreclosure of mortgage on lines of street railway and appurtenant property in the city of Los Angeles, alleged to have been given as security for an issue of bonds of the Pacific Railway Company. The defendants in the action are numerous, but only the company named prosecutes the present appeal. There was a former appeal from the judgment by certain other defendants (*Illinois Trust etc. Bank* v. *Pacific*

*Ry. Co.*, 115 Cal. 285); the questions there raised, how-
ever, have little or no affinity with those made here;
these relate mainly to the personal liability of the Pa-
cific Railway Company to pay said bonds; the court be-
low made findings on which followed certain provisions
of the judgment to the effect that the bonds were the
lawful obligations of said company, and that if the
available proceeds of sale of the encumbered property,
which was subject to the lien of a prior mortgage for a
large sum, should be insufficient to discharge the sum
found due on the bonds, then that said company pay
the amount of the deficiency; to those findings appel-
lant directed its motion for new trial.

The Los Angeles Cable Railway Company, one of the
defendants, a corporation organized under the laws of
this state, was in the year 1889 the owner of the street
railway property aforesaid, and had incurred large in-
debtedness—both floating and bonded—in the acquisi-
tion and construction of the same; there were bonds of
said cable railway company outstanding to the amount
of $836,000, secured by a mortgage on the said property,
dated September 15, 1887, to Alvord and Brown,
trustees. About the month of August, 1889, the rail-
way system of the said cable railway company being
then nearly completed, the holders of a majority of the
capital stock of that company, residing at the city of
Chicago, Illinois, associated themselves in the incorpo-
ration of the appellant, Pacific Railway Company, under
the laws of the state of Illinois; its object, as stated in
its articles, being to build, extend, purchase, acquire,
maintain, operate, sell, etc., street-cars and street rail-
ways in the city of Los Angeles, California, and else-
where. The purpose of the promoters of the new
company was to substitute the same in the ownership
of the property, rights, and interests, of the said cable
railway company, and thus carry on the enterprises in-
itiated by the latter and assume also its liabilities. Ac-
cordingly nearly all of the stock in the cable railway
company was transferred by the holders thereof to the

new Pacific Railway Company in exchange for shares of the latter, and on October 9, 1889, the cable railway company made a deed purporting to convey all its franchises and other property to the Pacific Railway Company. On August 24, 1889, the last-named corporation made formal provision for an issue of its bonds to the amount of $2,500,000, secured by mortgage to the plaintiff here as trustee, bearing date on said August 24, 1889, which mortgage in terms covered all the property the Pacific Railway Company owned, or might thereafter acquire, specifically including that to be acquired from the said cable railway company. These bonds, which are the occasion of the present controversy, were 2,500 in number, each for the sum of $1,000, and were payable to bearer in lawful money of the United States at the office of the trustee in the city of Chicago, on January 1, 1920, with interest payable semi-annually; each contained a provision that the principal might become due in case of six months' default in payment of interest, according to the conditions of the mortgage, which allowed the trustee, in such case, upon the request of the holders of a majority of the bonds outstanding, to declare the principal thereof at once due and payable. The Pacific Railway Company endeavored to exchange part of this issue for the bonds of the cable railway company issued previously and secured by the mortgage to Alvord and Brown; 836 of the new bonds were set apart in the hands of the trustee for that purpose, but the measure failed—the holders of the cable railway company's bonds declining the proposal. The remaining 1,664 bonds were certified by the trustee as secured by said mortgage of August 24, 1889, and were delivered to appellant for disposition; all were duly attested by the signatures of the president and secretary of the company and the impress of its corporate seal.

On May 1, 1890, the Pacific Railway Company received possession of the lines of street railway and other property described in the deed of the cable railway company, and thereafter controlled and operated the

same.   On June 25, 1890, and after the negotiation of a large part of the bond issue, the Pacific Railway Company made a so-called supplemental agreement with plaintiff purporting to provide, among other things, that engraved bonds might be substituted for the entire issue of August 24, 1889 (which had been printed by the lithographic process), and that such engraved bonds should be payable in gold coin, and, at the option of the holder, either in Chicago or New York, and that all provisions of the mortgage made to secure the lithographed bonds should stand for the security of the engraved bonds; holders of the former description of bonds were to be allowed to exchange them for the latter.   The form of trustee's certificate indorsed on the engraved bonds differed from that on the lithographed bonds in that it stated the substance of said so-called supplemental agreement, but there was no change in the terms of the bonds themselves—the verbiage of the engraved bonds being the same as that of the lithographed.   There was some replacement of lithographed with engraved bonds; but precisely how many were so replaced is not clear.

Afterward the Los Angeles Cable Railway Company executed a deed dated July 18, 1890, in favor of the plaintiff and of the Pacific Railway Company, both of whom expressly signified assent thereto.   In such deed most of the proceedings we have described were recited —that the said cable railway company had by deed, dated October 9, 1889, conveyed all its effects, real and personal, to the Pacific Railway Company; that the latter had, by measures legally taken, provided for an issue of bonds in the sum of $2,500,000, and, to secure the same, executed to plaintiff the mortgage of August 24, 1889; and that such mortgage had been supplemented by the agreement of June 25, 1890, to pay the bonds in gold coin, etc.; the deed then in terms granted and confirmed to the plaintiff, in trust for the uses and purposes specified in the said mortgage of August 24, 1889, all the right, title, and interest of the cable rail-

way company in the property aforesaid, to be held by
the trustee for the benefit and security of the holders
of the bonds of the Pacific Railway Company, and the
cable railway company adopted as its own the said
mortgage of the Pacific Railway Company to the extent
that that instrument purported to pledge the property
for the payment of the bonds.   This confirmatory deed
of the cable railway company was approved by the
board of directors of that company and the vote of all
its stock; a majority of said directors were officers or
employees of the Pacific Railway Company, however,
and 24,975 of the total 25,000 shares of such capital
stock were held and controlled by the plaintiff, Illinois
Trust & Savings Bank, to whom they had been hypoth-
ecated by the Pacific Railway Company, as part of the
security for the bonds.

There are questions in the case relating to the man-
ner of disposition of the bonds and the authority of the
officers of the Pacific Railway Company in that behalf;
some account of its internal organization and procedure
is therefore proper.   One C. B. Holmes was the president
of both the said Cable Railway Company and the Pacific
Railway Company, and he was, as the evidence shows,
the "financial manager" of the Pacific Railway Company
from the beginning.   It was provided in the by-laws of
the latter company that its affairs should be managed
by a board of five directors who might appoint a general
manager to have direct charge of the business transac-
tions of the company; that the board might incur in-
debtedness by resolution, and secure payment of the
same by mortgage or trust deed of the property of the
company, or any part thereof; the terms and amount of
such indebtedness to be entered on the minutes of the
board, and notes or other obligations given therefor
executed in such manner as the board might prescribe;
that all bonds, contracts, or other instruments required
to be made on behalf of the company should be executed
by the president, and " also be signed by the secretary";
that the president should not execute any such bond,

contract, or other instrument without previous authority
from the board. The resolution of the board of direct-
ors adopted preliminary to the mortgage and bonds of
1889 recited that the company had in contemplation
the purchase of the street railway system then owned
by the cable railway company, and had, therefore, ac-
quired the major part of the capital stock of that com-
pany; that the plan for such purchase involved the
advancement of funds by the Pacific Railway Company
to meet maturing obligations of the cable railway com-
pany, and to complete its undertakings, and that it was
to the interest of the Pacific Railway Company that such
advances be made. It was then declared that the Pa-
cific Railway Company would furnish funds for those
purposes to the cable railway company, the amounts
and objects of such advances to meet the approval of
the board of directors of the Pacific Railway Company;
and to that end it was resolved that the president and
secretary of the Pacific Railway Company were author-
ized and directed to execute, seal, and negotiate in its
corporate name $2,500,000 of first mortgage bonds, and,
as security for payment thereof, execute to the plaintiff
here a mortgage, etc.

There was evidence tending to show that of the 1664
bonds available, 513 were sold, 1119 were pledged as
collateral for other obligations amounting to $980,000,
and 32 were not disposed of at all. So far as shown by
the evidence, the various pledgees of bonds received
them from C. B. Holmes, president of the Pacific Rail-
way Company, as collateral security for promissory notes
executed to them, respectively, by him in the name of
the company, the nominal amount of bonds pledged
being in each instance somewhat greater than the note
secured. On January 24, 1890, the board of directors
of the Pacific Railway Company adopted a resolution
requesting the trustee to deliver to the president " the
remaining $500,000 of bonds held by said trustee, for
the purpose of negotiating the same and obtaining
money for the use of the company." There was evi-

dence that all the moneys received from the hypotheca-
tion of the bonds—and it seems also the proceeds of
those sold—were used and expended by the Pacific Rail-
way Company for its corporate purposes, and mainly,
if not wholly, for the purposes indicated in the resolu-
tions of the board of directors providing for the bond
issue, viz., paying the debts contracted by the cable
railway company in constructing its roads, and to com-
plete and equip the same. Default occurred in the pay-
ment of interest on the bonds, and when this had
continued for a period of six months, the trustee, being
thereunto instructed by the holders of a majority of the
bonds outstanding, declared the bonds to be immediately
due according to their terms, and gave written notice
of such action to the Pacific Railway Company, and
demanded payment; thereafter this action was insti-
tuted. The court below found and adjudged that there
is due to plaintiff, as trustee for the benefit of the hold-
ers of the bonds of the Pacific Railway Company, the
sum of $1,360,000 principal (not $1,323,353.75, supposed
in appellant's brief; the latter sum was the amount
found to be due on the prior mortgage of the cable rail-
way company to Alvord and Brown), and a further sum
of $317,101 for accrued interest.

1. It was the opinion of the superior court, expressed
in its findings, that the deed made in October, 1889, by
the Cable Railway Company, of all its property, fran-
chises, etc., to the Pacific Railway Company, and also
the supplementary agreement between the Pacific Rail-
way Company and the trustee and bondholders, dated
June 25, 1890, were void, and of no effect. We need not
inquire into the grounds of correctness of that conclu-
sion, for that it was correct is virtually assumed by
both parties to the appeal. But that court held that
the tripartite agreement of date July 18, 1890—whereby
the cable railway company adopted the mortgage exe-
cuted to plaintiff by the Pacific Railway Company, and
undertook that its property should stand charged for
the payment of the bonds in question—was effectual,

and created a valid lien on the property subordinate to the lien of the prior mortgage to Alvord and Brown. This result is combated by the appellant, though it can hardly be that the decision in that particular operated to appellant's detriment, except in so far as it tended to sustain the right of plaintiff to sue as trustee for the benefit of the bondholders.   The objections are, in brief, that the deed was *ultra vires* of the cable railway company, and that the plaintiff controlled the cable company's stock, and the Pacific Railway Company its board of directors.   Clearly, these matters are of no concern to appellant; if, by any means, it coerced the cable railway company into the hypothecation of the latter's property to secure appellant's bonds, that is no ground upon which appellant can defeat such security.   The judgment, from which the cable company has not appealed, is conclusive upon that company that its deed and contract of July 18, 1880, was not *ultra vires*, but was valid and operative, and the appellant is in no position to contest such results; nor would it be even if it had not expressly assented to that contract.   (*Baines* v. *Babcock*, 95 Cal. 581, 591–2; 29 Am. St. Rep. 158; *Campbell* v. *Argenta etc. Min. Co.*, 51 Fed. Rep. 1; 5 Thompson on Corporations, 6028, 6030, and cases cited.)   These considerations suffice also to answer the further objection, that plaintiff has no standing to sue, and that the right of action, if any exists, is in the several holders of the bonds.   Since there is mortgage security for the bonds, the action must be directed to enforcement of the security (Code Civ. Proc., sec. 726), and is properly brought by the plaintiff as mortgagee in trust.

2. But it is said that the bonds themselves were issued in contravention of law and are void in the hands of the holders; this is asserted, as we understand appellant's contention, because of the connection between the issue of the bonds and the attempted acquisition by the Pacific Railway Company of the property and franchises of the cable railway company, on which it was supposed when the bonds were authorized that

they would be secured; the argument necessarily assumes, though it is not precisely so stated, that whoever bought a bond thereby promoted an illegal enterprise and must lose his money. We dissent from this view. Granting that it was *ultra vires* of the Pacific Railway Company to mortgage the property of the cable railway company, it was still *intra vires* for it to borrow money and issue evidence of indebtedness; this is not disputed; consequently its bonds were not invalidated by the want of power to make the mortgage by which they were in terms secured. (*Philadelphia etc. R. R. Co.* v. *Lewis,* 33 Pa. St. 33; 75 Am. Dec. 574.) If then there was any taint of illegality in the sale or pledge of the bonds it must have lain in the purpose to which the proceeds were designed by the Pacific Railway Company—paying the debts of the cable railway company, completing and extending its scheme of street transit. There was nothing criminal or against good morals in the effort of the Pacific Railway Company to acquire the entire plant and franchises of the cable railway company; at the most, it was an attempt at something beyond the charter powers of the companies and forbidden by considerations. of public policy; but that was a vice which infected only the contract of the two corporations; the issue and disposition of bonds to third persons constituted a series of transactions each resting on a new consideration and connected only indirectly with the contract between the corporations. Admitting, as urged by appellant, that the holders had notice of the purposes of the Pacific Railway Company, yet they did nothing to promote those purposes beyond parting with their property on the faith of its obligations; they do not found their right of recovery on the illegal contract between the companies; and in our opinion they are not affected by it. (*Taylor* v. *North etc. Min. Co.,* 79 Cal. 285; *Armstrong* v. *American etc. Nat. Bank,* 133 U. S. 433, 469; *Milborne* v. *Royal Benefit Soc.,* 43 N. Y. Supp. 1026; *Curtis* v. *Leavitt,* 15 N. Y. 94, 296; *Anheuser-Busch Assn.*

v. *Mason*, 44 Minn. 318; 20 Am. St. Rep. 580; *House* v. *Soder*, 36 Tex. 629.)

3. By the constitution of Illinois it is provided that no railroad corporation shall issue stock or bonds except for money, labor, or property actually received and applied to the purposes for which such corporation was created; the constitution of this state, Article XII, section 11, contains a similar provision—omitting the clause as to application of the money, labor, or property. Upon these provisions appellant contends that it had no power to pledge its own bonds as collateral security. When the bonds were so pledged and money or other property was actually received in consequence of such use of them, it seems to us that in a just and natural sense the bonds were issued "for" such money or property; they served the purpose designed by the company— procured value for it. The cases upon the subject uphold the right to pledge as included in the right to sell. (*Farmers' Loan etc. Co.* v. *Toledo etc. R. R. Co.*, 54 Fed. Rep. 759; *Leo* v. *Union Pac. Ry. Co.*, 17 Fed. Rep. 273; *Nelson* v. *Hubbard*, 96 Ala. 238—decided in view of a constitutional provision substantially the same as that of California in this particular; *Duncomb* v. *New York etc. R. R. Co.*, 84 N. Y. 190.) Some of these cases recognize the right of the corporation to pledge its bonds to secure a precedent debt. Appellant relies somewhat on *Brewster* v. *Hartley*, 37 Cal. 15; 99 Am. Dec. 237, where it was held that certificates of stock issued by a corporation in pledge to secure its debt, are illegally issued; an examination of the grounds upon which the decision went in that case shows, we think, that the question here presented is widely different; it seems unnecessary to enlarge upon the points of diversity. (See, besides the cases cited above, 1 Morawetz on Corporations, secs. 349, 350; *Pfister* v. *Milwaukee etc. Ry. Co.*, 83 Wis. 86.)

4. But now it is claimed that Holmes had no authority to borrow money in the company's name and pledge the bonds for repayment thereof; that it had no knowledge of his proceedings in that behalf, and is not bound

thereby; this aside from the question of the corporate power of the company to make that use of the bonds. It is plain enough that the president had precedent authority to negotiate the bonds; the language of the resolution providing for their issue, "That the president and secretary are hereby authorized and directed to execute, seal, and negotiate," etc., is to be taken distributively; both the president and secretary were to sign the bonds, and, in that sense, execute them; such was the provision of the by-laws; but the company committed the negotiation of them to the president; this is apparent from the evidence that he was at all times the financial manager of the company, and was allowed to control the disposition of the bonds, and from the resolution adopted by the board of directors January 24, 1890, requesting the trustee to deliver to the president "the remaining $500,000 of bonds for the purpose of negotiating the same and obtaining money for the use of the company."

Whether the authority to negotiate the bonds carried with it the power to pledge need not be inquired, though it seems that under proper circumstances an agency to negotiate securities includes the right to pledge them. (See the cases collected in 15 Am. & Eng. Ency. of Law, 478, n. 4.) In the present case, the subsequent conduct of the Pacific Railway Company defined the scope of the president's authority in that particular, and its objection to his power to pledge the bonds comes too late. For the purposes which were the inducing cause of the issue of bonds, the company expended the large sums raised by pledge thereof. The practice of the president to pledge the bonds extended over a period of more than a year. There is no proof that the company had not actual notice of his transactions, and it is scarcely credible that it had not; but this is immaterial; it can hardly be that a company situated as this was—relying chiefly, if not solely, on the avails of the bonds to carry through the enterprise on which it had embarked, having committed the negotiation of the bonds to the

president, and expending the funds raised by him to promote its corporate objects—can be heard to say that it did not know the manner in which he was disposing of the bonds, and so enjoy the benefit but evade the concomitant liability of that disposition; such knowledge is imputed. (*Underhill* v. *Santa Barbara etc. Co.*, 93 Cal. 300; *San Diego etc. R. R. Co.* v. *Pacific Beach Co.*, 112 Cal. 53; *Lady Washington Co.* v. *Wood*, 113 Cal. 482; 5 Thompson on Corporations, secs. 5293, 5308; *Carpy* v. *Dowdell*, 115 Cal. 677.) Besides, the holders of such bonds as collateral have the same right as outright purchasers to press for a sale of the mortgaged property (Jones on Corporate Bonds, sec. 394); here they did so press, and, at their instance mainly, the trustee declared the principal of all bonds outstanding to be due, and notified such declaration in writing to appellant, together with demand for payment. It does not appear that appellant made objection that any bonds had been improperly placed by the president, then, or ever at all, until more than a year later, when, on September 6, 1892, its answer to the amended complaint was filed; and then the objection, if such it may be called, consisted only in denials for want of information and belief that any bonds had been issued, and the like. This failure to repudiate liability to the holders of pledged bonds within a reasonable time after it was thus imperatively asserted, is further ground for the conclusion we have reached that the company acquiesced in and so ratified the president's assumption that his agency to negotiate the bonds extended to the hypothecation of them. (*Union Gold Min. Co.* v. *National Bank*, 96 U. S. 640; *Pittsburg etc. Ry. Co.* v. *Keokuk Bridge Co.*, 131 U. S. 371, 381.)

In some instances bonds were pledged for liabilities of the cable railway company, there being a novation of the Pacific Railway Company in the stead of the cable company. We do not understand appellant to lay much stress on this circumstance, and, in our opinion, it does not affect the case; it was part of the plan

of the Pacific Railway Company to take up the obliga-
tions of the cable company, and, in the process of ac-
cepting the bonds as security, the creditors of the cable
company gave up their demands against it, and so
parted with value, which, so far as appears, was the
equivalent of cash.

It is said that the notes given by Holmes, signed, in
the name of the Pacific Railway Company, by him as
president, were executed in contravention of the by-
laws.  But this is not important if our views regarding
the effect of the approval of his action by the conduct
of the company are correct.  A corporation whose in-
ternal polity requires its contracts to be executed in a
certain manner may, by acquiescence, become liable
upon contracts made by its agents in some other man-
ner.  (*Argenti* v. *San Francisco*, 16 Cal. 256; *Underhill*
v. *Santa Barbara etc. Co., supra;* 2 Morawetz on Corpo-
rations, 633, 675.)

5. It is contended that the evidence fails to sustain
the decision as to the amount of appellant's liability—
$1,360,000, besides interest—and it is to be admitted
that the *datum* from which the court found that to be
the precise sum due is not apparent.  But, as there was
evidence that 513 bonds were sold, establishing a liabil-
ity on these of $513,000, and that 1119 were pledged
as collateral security for indebtedness amounting to
$980,000, and these sums together considerably exceed
the amount of the finding, the appellant has not suffered
injury in this behalf.  The evidence concerning the
total number of bonds disposed of was not as definite
as it should have been, but it was received without ob-
jection and made a *prima facie* case; since appellant
had received the custody of the bonds from the trustee,
it would seem that the falsity of plaintiff's showing as
to the number outstanding might easily have been
proved, if false it was.

Not much is said in argument concerning the en-
graved bonds which were issued in lieu of lithographed
bonds of corresponding numbers; on the face of them

they did not differ in terms from the lithographed bonds, and the judgment in no way discriminates between the obligation of the two classes of instruments; we think, therefore, the engraved are to be regarded as mere duplicates or reissues of the lithographed bonds, for which they were exchanged. (Thompson on Corporations, sec. 6231.) Questions of pleading discussed by counsel, as well as some minor matters, are not important to be considered in view of the conclusions we have stated on the merits of the case.

The order appealed from should be affirmed.

SEARLS, C., and HAYNES, C., concurred.

For the reasons given in the foregoing opinion the order appealed from is affirmed.

HARRISON, J., VAN FLEET, J., GAROUTTE, J.