FIRST SAVINGS & TRUST CO. et al. v. WAUKESHA CANNING CO. et al.

(Circuit Court of Appeals, Seventh Circuit.   January 14, 1914.)

No. 2001.

1. CORPORATIONS (§ 469*)—BONDS—SALE FOR MONEY, LABOR, OR PROPERTY.

Under St. Wis. 1913, § 1753, providing that no corporation shall issue bonds except for money, labor, or property estimated at its true value actually received equal to 75 per cent. of the par value thereof, and that all bonds issued contrary thereto shall be void, where the creditors of a corporation accepted its bonds secured by a mortgage as collateral for their past-due claims at not less than 75 per cent. of their face value, and extended the time of payment of the claims, the bonds were issued for property at not less than 75 per cent. of their value, as the creditors took them with the obligation either to return them, or to account therefor at 75 cents on the dollar.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1832; Dec. Dig. § 469.*]

2. CORPORATIONS (§ 472*)—BONDS—SALE FOR MONEY, LABOR, OR PROPERTY.

Where a corporation, which was being pressed by its creditors, issued its bonds secured by mortgage and delivered them as collateral security, the creditors were advised of the statutory provision, and told that the bonds would be void if received on a basis of less than 75 per cent. of their face value, in no case were bonds delivered on a basis of less than 75 per cent. of their value, and the creditors, in seeking their enforcement, were asking that they be charged with the bonds at such rate, the facts showed an agreement to accept them at that rate, and hence they were not void under St. Wis. 1913, § 1753.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1837, 1839, 1841; Dec. Dig. § 472.*]

Appeal from the District Court of the United States for the Eastern District of Wisconsin; Arthur L. Sanborn, Judge.

Stockholder's bill by William H. Nichols against the Waukesha Canning Company. From a decree dismissing the cross-bill of the First Savings & Trust Company as trustee, it appeals. Reversed, with directions.

In pursuance of the plan agreed upon by all the creditors and the principal stockholders at a meeting held about November, 1909, to consider the financial condition of appellee, it was decided to issue bonds to the amount of $150,000, to be secured by mortgage upon the real property of appellee, which bonds were to be used for the purpose of retiring the indebtedness, or to obtain extensions through collateralizing same. Consent of the preferred stockholders was obtained to such an arrangement. Afterwards, at the annual meeting of appellee's stockholders held on February 14, 1910, it was, in substance, voted that it was necessary that a large portion of the indebtedness of the company be refunded and secured; that in order to do so it was necessary that security be given; that therefore bonds to the amount of $150,000 and a mortgage securing the same were authorized, "the terms, provisions and conditions, number and amount of such bonds to be determined and fixed by the board of directors, to be either sold or used as collateral security by the proper officers of the company under the direction and authority of the board of directors for the purpose of refunding present indebtedness of the company or to provide new funds with which to prepare for the coming season's business."

The creditors, including several banks, were pressing appellee for their money, calling their loans, and refusing to renew, and demanding payment or security. Thereupon, and on February 15, 1910, the bonds were executed, and the mortgage securing the same executed and recorded. These steps were all approved by the board of directors. One Wm. H. Nichols, who had been made president and general manager of appellee, was authorized to dispose of the bonds for the benefit of appellee, and to liquidate, refund, renew, or secure, as the case required, or as he might deem best for the company, any or all of the indebtedness then existing. Afterwards, by and with the aid of F. T. Stare, president, and C. S. Crary, vice president of appellee, said Nichols delivered $123,500 of said bonds to the respective creditors to be received by them as collateral security to their several claims, without other consideration than the extension of the time in which to pay said respective claims. In some instances new notes were taken, in others no change in the form of the indebtedness was made. All the claims thus secured had accrued prior to the giving or taking of the security. Both Stare and Crary testified that they were respectively advised, prior to the placing of the said collateral, that the issue of bonds would be illegal if pledged at any less valuation than 75 per cent. of their face; that they were so advised before any of the bonds were issued, but were not advised of the necessity of taking a formal stipulation from the creditor that the same were received on that basis. One Markham testified that Nichols told him the bonds must be accounted for on that basis. Nichols himself testified that he secured several claims without knowing about this provision of the Wisconsin statute, but was obliged to comply with it in taking

security in return.  This statutory provision appears to have been a matter of common talk in placing the collateral.  Crary testified that there was in no instance an agreement to hold the collateral at 75 per cent. of its face value, but that "there was a statement on my part to each one, and so specifically made that I did not want them to misunderstand it, that if they accepted the bonds they must accept them on a basis as good as 75 per cent. of their face value, or the collateral would be worthless to them, as I understand the Wisconsin statute."  The bonds were actually taken as collateral at not less than 75 per cent. of their face value by the several creditors, after being respectively cautioned by Crary, as above set out.

Thereafter said Nichols brought a stockholders' bill against appellee corporation and secured the appointment of himself and one Cambier as receivers, by whom possession was taken of all the property and effects of appellee. Default having been made in the payment of interest upon the collateralized bonds aforesaid, appellant as trustee under the trust deed securing said bond issue, at the request of the bondholders filed its cross-bill to foreclose the trust deed.  The corporation appellee and its receivers filed their answers, opposing foreclosure and asking that the trust deed and bonds secured thereby be canceled, as being given in contravention of section 1753 of the Wisconsin Revised Statutes, which reads as follows, viz.: "No corporation shall issue any stock or certificate of stock except in consideration of money or of labor or property estimated at its true money value, actually received by it, equal to the par value thereof, nor any bonds or other evidences of indebtedness except for money or for labor or property estimated at its true money value, actually received by it, equal to seventy-five per cent. of the par value thereof, and all stocks and bonds issued contrary to the provisions of law and all fictitious increase of the capital stock of any corporation shall be void."

On the hearing the District Court held that the bonds in question and the trust deed securing the same came within the prohibition of section 1753 aforesaid, and were invalid and void, and ordered that the bonds be delivered for cancellation and that appellant satisfy and discharge said mortgage.  The cause is now here on appeal from said finding and order, and the same are assigned for error.

Miller, Mack & Fairchild and Bloodgood, Kemper & Bloodgood, all of Milwaukee, Wis. (Jackson B. Kemper, Wheeler P. Bloodgood, and Arthur W. Fairchild, all of Milwaukee, Wis., of counsel), for appellants.

Merton, Newbury & Jacobson, of Waukesha, Wis., for appellees.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). [1] The question presented is, whether the placing of the bonds under consideration as collateral to the indebtedness of appellee existing prior to the issue thereof was obnoxious to the terms of section 1753 of the statutes of Wisconsin aforesaid.  Concretely stated, did the issue and application of the bonds in suit as collateral security to existing indebtedness constitute the issue and application of bonds for money or labor or property?

"The object of the statute," says Chief Justice Lyon in Pfister et al. v. Milwaukee Electric Railroad Company, 83 Wis. 86, 53 N. W. 27, "is to protect stockholders and bona fide creditors from the improvident issue of its bonds by the corporation. * * * When a corporation puts its bonds beyond its control by hypothecating them as security for loans, or for any other purpose, or in any other manner, it issues them within the meaning of the statute."

To the same effect are Hinckley v. Pfister, 83 Wis. 64, 53 N. W. 21, and Memphis, etc., R. R. Co. v. Dow, 120 U. S. 298, 7 Sup. Ct. 482, 30 L. Ed. 595.

Undoubtedly the plain intention of the statute is that corporations shall get the benefit of at least 75 per cent. of the face value of the bonds so issued.

There are two ways in which property interests may be enhanced. One consists in the increase of the quantity, and the other in the increase of the quality. In either case the benefit arising from the application of the bond issue or the proceeds thereof inures to the owner. Had the bonds been applied in satisfaction of appellee's indebtedness pro tanto, there would undoubtedly have been a compliance with the statute. Assuming that the bonds were pledged for 75 per cent. of their face value, what was the legal effect of the acceptance thereof as collateral? It is clear that the creditors took them with the obligation either to return same or to account for them at 75 cents on the dollar. If the creditor chooses to dispose of his bonds at a price less than 75 cents, the loss is his. Here the creditors are asking that they be charged with the bonds at the rate of 75 per cent. of their face. Thus it appears that the issuing corporation got 75 cents on the dollar for its bonds, and the spirit at least of the statute was complied with.

But, says appellee, quoting the language of Judge Ross at the circuit, "the money paid, labor done, or property actually received, must be paid, performed, or received, as the case may be, on account of the issuance of the bonds; and any bonds issued contrary to this provision are of course illegally issued. The provision does not mean, and cannot be held to mean, that such bonds may be issued as collateral security for any sort of pre-existing indebtedness."

The language of the statute does not, in our view of it, justify the conclusion arrived at in the case just quoted. If it be that an increase of the interest of the corporation in its assets is equivalent to the acquirement of property to the amount of such increase, and it be further true that the agreement of the creditors to accept the bonds at a valuation of 75 per cent. of their face upon their several claims results in the reduction of the unsecured indebtedness in a sum equal to 75 per cent. of the face of the bonds, why does not the placing of the bonds as collateral result in the enhancing, to that extent, of. the interest of the appellee• in its property just as advantageously as though appellee had acquired that much more property and incurred the bonded debt, as well as its unsecured indebtedness? How can it then be said that the issue of bonds was not made for money or labor or property at its true money value actually received? The statute is not in its terms technical. It does not attempt to say how the money, labor, or property shall be procured. It is said in Nelson v. Hubbard, 96 Ala. 238, 11 South. 428, 17 L. R. A. 375.

"And we do not think that such pledge [to secure debts already contracted], if made without fraud, and solely for the bona fide purpose of satisfactorily securing the payment of corporate debts, can properly be regarded as effecting a fictitious increase of indebtedness, or as not issued for money, labor done, or money or property actually received."

This case is cited approvingly by the United States Circuit Court of Appeals for the Fourth Circuit in Firth Co. v. S. C. Loan & Trust Co., 122 Fed. 575, 59 C. C. A. 73, and in Illinois Trust & Savings Bank v. Pacific Ry. Co., 117 Cal. 332, 49 Pac. 197.

The United States Circuit Court of Appeals for the Second Circuit held, in Re Waterloo Organ Co., 134 Fed. 345, 346, 67 C. C. A. 327, where a bond issue was transferred to a bank to secure accrued and future indebtedness, that the transaction complied with the requirements of the New York statute which provides that:

"No corporation shall issue either stock or bonds except for money, labor or property actually received for the use and lawful purposes of such corporation."

The court says in Hoskins v. Seaside Ice Mfg. & Cold Storage Co., 68 N. J. Eq. 476, 59 Atl. 645:

"Nor does the fact that some of these bonds were taken as collateral security for an existing debt make the holder any less a bona fide holder for value than if he was a purchaser for cash."

In Cook on Corporations (5th Ed.) § 763, it is said:

"A constitutional provision against the issue of bonds except for money, labor, or property, does not prevent the corporation from pledging its bonds."

That a bond may be collateralized to secure an existing debt is the conclusion of the New York court in Duncomb v. N. Y., etc., R. R. Co., 84 N. Y. 190.

We are therefore of the opinion that in agreeing to take the bonds in question as collateral at the rate of not less than 75 per cent. of their face value upon their past-due claims, and in extending time of payment of the same, the present bondholders afforded to the corporation a valid property consideration equal to 75 per cent. of the face of the bonds, and are therefore satisfying the demands of the Wisconsin statute above set out, provided, of course, the creditors had agreed to accept the bonds on that basis. As to this proposition, all the creditors, excepting perhaps American Appraisal Company, are in the same situation. Unless there was such an agreement, the collateralized bonds are invalid. Pfister et al. v. Milwaukee Electric R. R. Co., 83 Wis. 86, 53 N. W. 27; Hinckley v. Pfister, 83 Wis. 64, 53 N. W. 21; National Foundry & Pipe Works, Ltd., v. Oconto Water Co. et al. (C. C.) 52 Fed. 29; Mowry v. Farmers' Loan & Trust Co., 76 Fed. 39, 22 C. C. A. 52; Haynes v. Kenosha Elec. Ry. Co., 139 Wis. 227, 119 N. W. 568, 121 N. W. 124.

In Re Waterloo Organ Co., supra, it was said:

"The record fails to show any written agreement fixing the value at which the bonds were issued. It is agreed that their par value was their fair market value. In case of doubt as to the character of a transaction, or as to the proper construction and interpretation of a contract, and the determination of the respective rights and obligations of the parties thereto, such doubts may be resolved, and the intention or understanding of the parties thereto may be determined, by a consideration of their relations, the objects they respectively had in view, their declarations at the time of the transaction, and their acts then and thereafter done."

In that case the court says further:

"In view of the amount then due, and the immediate increase by the bank of the company's line of discount until the direct liability alone of the company exceeded the fair market value or par value of said bonds, we think it may fairly be inferred that the company was in need of further funds in order

to carry on its corporate business; that the bank was unwilling to grant further credits, except upon receipt of further security, and that the agreement between the parties was that said bonds should be issued at their fair market value, * * * and that they were actually issued for property in the nature of advances, loans, discounts, credits, etc., received for the use and lawful purposes of said corporation; and that said issue, therefore, was valid."

The court found further evidence that the bonds were issued for par in the fact that the holders were, by the terms of the transfer instrument, authorized to sell the bonds to others at par and account for the proceeds.

"Under this arrangement," says the court, "the bank was bound to account for said bonds at their par value."

[2] So here, there was every reason why the creditors should obey the statute in taking the collateral. They were advised by the officers of the appellee corporation as to what the statute was, and that any attempt on their part to receive said bonds on a basis of less than 75 per cent. of their face would invalidate the issue. Appellee was in need of leniency and extension of its business liabilities. It was obliged to conciliate its creditors. The latter were placed in a somewhat better position as against future indebtedness of the appellee than before, while appellee was in no sense injured by the arrangement. No one can read the testimony of Crary without being impressed with his anxiety to impress upon the creditors the necessity of complying with the statute in respect to the 75 per cent. clause thereof. In addition, in no case were bonds turned over as collateral on a basis of less than 75 per cent. of their value. These creditors are now in court asking that they be permitted to proceed to avail themselves of that arrangement. It is incredible that, under the circumstances hereof, there should have been any hesitancy in accepting the plan proposed by Crary and his co-officials. We have no trouble in deducing from the facts presented an agreement between the appellee, through its officers, attorneys, and representatives, and the several creditors, that the bonds should be accepted by the latter on the basis of 75 per cent. of their face value.

We are therefore of the opinion that the District Court erred in dismissing the cross-bill and in ordering that the mortgage be satisfied and the bonds secured thereby canceled. The decree of the District Court is reversed, with directions to grant the prayer of the cross-bill and make such further orders as may be necessary in the premises.