DAKOTA TRUST COMPANY, a Corporation, Respondent, v. LUCKY STRIKE COAL COMPANY, a Corporation, et al., Appellants, and MARY H. ANDERS and J. B. Field, Interveners.

(215 N. W. 89.)

**Mortgages — striking out maker's option to redeem in bonds — not prejudicial to holders of unaltered notes.**

1. Where a trust deed is given to secure an obligation therein described, to be evidenced by certain notes with a definite maturity, each subject to a maker's option to redeem in long term bonds, and without any requirement that the option shall be exercised in the same manner with respect to all notes, it is *held* that the alteration of given notes, extending their maturity and striking out the maker's option to redeem in bonds, is not prejudicial to the rights of the holders of unaltered notes.

**Mortgages — altered notes — secured by trust deed — holders' rights.**

2. It is *held*, for reasons stated in the opinion, that the obligations evidenced by the altered notes are sufficiently identified as those secured by the trust deed, and that the holders of such notes are entitled to share ratably in the security.

**Corporations — bonds issued as collateral security for extending indebtedness — invalid.**

3. Under § 138 of the state Constitution and § 4528 of the Compiled Laws of 1913, which prohibit corporations from issuing stock or bonds except for money, labor done, or money or property actually received, bonds issued as collateral security for an existing indebtedness are invalid.

55 N. Dak.—38.

Opinion filed August 16, 1927.

Corporations, 14a C. J. § 2574 p. 620 n. 90.  Mortgages, 41 C. J. § 441 p. 507 n. 97 New.

Appeal from the District Court of Mercer County, *Berry*, J.
Affirmed.

*Schwartz & Higgins, O'Hare, Cox & Cox, T. H. McEnroe,* and *Conmy, Young & Burnett,* for appellants.

"A mortgage to secure all the debts due from the grantor to the grantee and all liabilities of the latter as surety for the former, is valid without a more particular description.  But when it is attempted to describe the debts secured, to entitle a debt to the benefits of the security it must come fairly within the terms of the mortgage.  The debt described in the mortgage is the debt secured."  1 Jones, Mortg. pp. 477, 478.

"It is sufficient if the note is so far described that it appears, with reasonable certainty, to be the note intended to be secured."  Weber v. Illing, 27 N. W. 834; Chavelle v. Washington Trust Co. 226 Fed. 400.

"No prudent man would ever buy a bond in the market, if the provisions made for its ultimate redemption could be altered without his consent."  Vose v. Bronson, 6 Wall. 455.

"If a new note for a different amount payable at another date, be given in place of one of several notes secured by the mortgage, without any agreement that it shall be secured by the mortgage, the holder loses his right to the security as against the holder of other notes, secured by the mortgage."  2 Jones, Mortg. 512.

"Stock issued as bonus stock in violation of § 138 of the Constitution which prohibits corporations from issuing stock or bonds excepting for money, labor or property received, is void."  Lavell v. Bullock, 43 N. D. 135, 174 N. W. 764.

"The power to borrow money and to mortgage or otherwise convey or pledge its property, real or personal, and its franchises to secure the payment of money so borrowed or any debt contracted by it includes the power to pledge the bonds of the corporation, secured by its mortgage, on property as collateral security for debts of the corpora-

tion presently created or already owed." Nelson v. Hubbard, 96 Ala. 238, 11 So. 428, 17 L.R.A. 375.

"An antecedent debt is sufficient to constitute a holding for value of collateral negotiable paper." Swift v. Tyson, 16 Pet. 1, 10 L. ed. 865.

*Zager & Tillotson* and *Sullivan, Hanley & Sullivan,* for respondent.

"Whatever be the form of the debt, if it can be traced, the security for it remains good." Jones, Mortg. 7th ed. 495.

A mortgage intended to secure a certain debt is valid in equity, for that purpose, whatever form the debt may assume, if it can be traced. Patterson v. Johnson, 7 Ohio, 225.

Literal exactness in description of note secured is not required. Ricketson v. Richardson, 19 Cal. 330. See also 13 Am. Dec. 72, 45 N. W. 744, and 28 S. W. 998.

Validity of a deed of mortgage depends upon the genuineness of the debt which the mortgage is given to secure and not upon a description of debt contained in the deed, nor upon the form of the indebtedness by note or otherwise. Hogdon v. Shannon, 4 N. H. 572.

A mortgage will protect the note intended to be covered by it, although by mistake or omission it is misdescribed, and the rule applies as against an attaching creditor, if there is no substantial difference between the note described and the one intended. Duser v. Walkup, 43 Mo. App. 625.

The remedies on a note or bond and on a mortgage are different, and either may be resorted to, and the loss of one does not cut off a resort to the other. Cheek v. Nail, 117 N. C. 370, 17 S. E. 80.

BIRDZELL, Ch. J. This is an action to foreclose a trust deed given to the plaintiff by the Lucky Strike Coal Company. On March 25, 1921, the board of directors of the coal company passed a resolution authorizing the execution of a deed to secure an issue of $50,000 of bonds. The deed was executed on March 25, 1921, and recorded April 13, 1921. It refers to and describes the obligations to be secured by it, reciting that the coal company is indebted to the holders of the indebtedness described in the principal sum of $50,000 as evidenced by 260 gold notes bearing even date, all maturing on September 25, 1921, payable in gold coin but providing that the notes may be paid by

the coal company by delivering to the holders a like amount of the first series of bonds maturing———years from date. The form of the note is contained in the deed and is as follows:

Gold Note

Lucky Strike Coal Company

Bismarck, N. D.

Dakota Trust Company,

Trustee.

Total Issue, $50,000.

Bismarck, North Dakota, March 25, 1921.

On or before September 25, 1921, without grace and for value received, the Lucky Strike Coal Company, a North Dakota corporation, promises to pay to the bearer thereof, at the office of the Dakota Trust Company, in Fargo, North Dakota, One Hundred Dollars, ($100) in gold coin of the United States of its present standard of weight and fineness, with interest thereon at the rate of eight per cent (8%), per annum: Provided, however, the maker hereof reserves the right to make such payment in bonds and hereby specially agrees to make the same by the delivery to the holder hereof, of a like amount of the First Series of Bonds of the said Lucky Strike Coal Company maturing ———years from the date hereof and drawing interest at the rate of eight per cent (8%), per annum, payable semi-annually, and paying the holder hereof the accrued interest hereon from the date of this note to the date of said bonds.

This note is one of a series of notes numbered from 1 to 260, both inclusive, of even date herewith, issued by said Company, aggregating the total sum of Fifty Thousand ($50,000) Dollars and all ratably. secured by a mortgage upon the property of said Company, duly recorded, given to the Dakota Trust Company of Fargo, North Dakota, as Trustee, to secure the payment thereof.

This note shall not be valid until the certificate of authentication endorsed hereon shall be attested by the signature of the President or Vice President of the Trustee above named.

Lucky Strike Coal Company,

Attest:                                   By ............... President.

............... Secretary.

Subsequent to the deed notes or bonds to the amount of $7,700 were issued and sold either for money or for goods delivered and services rendered. (These bonds were referred to in the trial court as class 1 bonds, while others are referred to as class 2 and class 3 bonds, and they will be so designated here.) The intervener, Mary H. Anders, became the owner of $4,300 worth of these class 1 obligations. It was found that the bonds did not sell readily, whereupon the manager of the company approved a change in their terms which would make them fall due in November instead of September and which would strike out the provisions for refunding through first series bonds. $9,900 worth of these bonds were sold. They are referred to as class 2 bonds. All of the remainder of the bonds, $31,400, were found to have been issued to secure pre-existing indebtedness of the company. These are designated as class 3 bonds. In addition to the obligations evidenced by the various bonds, some forty miners filed liens aggregating approximately $12,000. There is also a judgment in favor of the Bismarck Bank. The trial court in its judgment directed the foreclosure of the mortgage, declaring bonds of classes 1 and 2 to be valid and of class 3 to be invalid. Judgment was rendered for $25,445.66, principal and interest, plus $2,396.21 trustee's expenses and compensation and, in addition, for costs and disbursements. A sale of the property was ordered, with the proceeds to be applied, after payment of costs, expenses, disbursements and compensation, to the payment of the first and second class bonds. The miner's lien of John Powell, which was filed in September, 1921, was held to be subordinate to the lien of the trust deed but superior to the liens of the other miners, which were all filed in the following year. The judgment lien of the Bismarck Bank is held inferior to the lien of the trust deed and to that of Powell, but superior to the other miners' liens.

From this judgment, the intervener, Mary H. Anders, has appealed, and contends that the court erred in holding class 2 bonds to be secured on a parity with class 1. Mercer county, Nettie Hayes and the numerous defendants owning miners' liens have appealed and likewise attack the judgment in so far as it admits class 2 bonds to share in the proceeds of the sale on an equality with class 1. There is also a specification that the court erred in holding one of these liens, that of John Powell, in the sum of $98.64, filed September 14, 1921, to

be subordinate, and in holding all the other miners' liens filed at later dates to be inferior to the liens of the second class bondholders.

The Marshall Malaise Lumber Company, Margaret N. Farr, and Lloyd C. Quinn, being owners of bonds of the third class, also appeal from the judgment, specifying error upon the findings of the trial court to the effect that the notes held by them were not delivered to them or their predecessors in interest for value, but were delivered as collateral security for pre-existing indebtedness.

Thus, there is presented for our consideration, first, questions of the validity of the bonds, and, second, priority of the liens. Considering, first, the appeal of the intervener, Mary H. Anders, are the bonds of the second class invalid or not entitled to share in the security on an equality with her first class bonds? The due date, September 25th, is stricken out and over it is written November 1st. The paragraph under which the maker reserved the right to pay in long term bonds is stricken out entirely. Hence, these bonds of the second class are in reality short term notes falling due November 1, 1921, instead of September 25, 1921, and without the privilege of redemption by the issuance of first series bonds. Each note, however, recites that it is one of a series numbered from 1 to 260 of even date, aggregating the total sum of $50,000, all secured by a mortgage given to the Dakota Trust Company and that it is not to be valid until authenticated by the signature of the president or vice president of the trustee. It bears a certificate of authentication as of March 25, 1921; likewise, a certificate of registration as of a later date. The appellant Anders, while making no contention that these bonds are not secured by the mortgage, argues that they are necessarily inferior and subsequent to the lien of her unaltered bonds. The record shows that the minutes of the board of directors contain no resolution approving or ratifying the change; that the manager of the company talked with the directors and with the president of the company and that a majority of the directors authorized and directed him to make the alteration; that the alterations were made by the manager with the knowledge and consent of the president and a majority of the board of directors, it being stipulated that the manager of the company would so testify. However, the testimony of the directors indicates that a majority of the board of directors was opposed to the alterations when the matter was brought to their

attention; that the altered notes were sold for cash, or its equivalent, and the proceeds turned over to the company; that the company never repudiated nor rescinded the transaction but refused to do so.

It is contended that no material change could be made in any of the terms of the notes without the consent of every holder of notes issued. It is said that the holder of each note or bond is brought into contract relations with every other holder and, inasmuch as each note refers to the trust deed securing all of them, that no note can be altered without affecting the contract rights of the holder of an unaltered note. The validity of these contentions, in our opinion, depends on the character and effect of the alterations upon the rights of the holder of an unaltered note. There are two alterations and they must be considered separately. First, the due date is changed from September 25, 1921, to November 1, 1921. What is the effect of this change upon the rights of the holder of an original note? It cannot postpone his right to foreclose the mortgage upon the nonpayment of his note. It cannot affect his right to a personal judgment. It does not increase the amount for which the trust deed is to stand as security. It can only operate to postpone the time when the holders of the altered notes may avail themselves of the rights enjoyed by the holders of the unaltered notes. It cannot affect the latter prejudicially in the bondholders' relations inter sese.

The second alteration strikes from the bonds the obligor's option to redeem by delivery to the bearer of a like amount of first series bonds maturing two years from date. Inasmuch as this is an obligor's option the holder of any unaltered note could not insist upon its redemption in this manner. In other words, the obligor would fulfil its obligation to the letter by making payment on or before September 25, 1921, and, if it should elect so to do, the holder could not insist upon receiving bonds maturing at a later date in exchange for the short time notes, not even if default should be made in payment; neither could any holder complain if the obligor should elect to pay him in cash while availing itself of the option to redeem other notes in first series bonds. There is no obligation expressed in the note or the trust deed binding the obligor to treat all holders of short time obligations alike in this respect. If the holder of a short-time unaltered note would be in no position to complain of a discrimination by the obligor in this respect

at the time of the maturity of the short-time notes, he is not prejudiced by an agreement in advance of maturity that will preclude the obligor from the exercise of the option in particular instances. To express the thought otherwise: the holder of the unaltered short time notes was content to contract that upon maturity the maker might have the option to redeem in first series bonds without a provision requiring the option to be exercised in the same manner as to all note holders, and his rights are, therefore, not affected differently by the striking out of this provision than they would be if at the maturity of the short-time note the obligor should elect in one instance to redeem in first series bonds and in another instance not to do so.

There can be no question of the identity of the debt for which the deed is to stand as security. Each note evidencing the debt recites that it is one of a series numbered from 1 to 260, both inclusive. The aggregate amount of the indebtedness is stated and it contains a statement that all are ratably secured by the trust deed; and each note is further identified by its serial number and by the certificate of the vice president of the trustee, as well as by registration. We are of the opinion, therefore, that the holders of the second class bonds are entitled to share ratably with the holders of the first class bonds in the security of the trust deed, all of such notes being overdue and in default when the action was begun. Since, then, in any event the holders of bonds of the first and second classes are entitled to share ratably in the security, it is unnecessary to consider whether or not the alterations were authorized by the company.

We must consider next the question of the validity of the third class bonds, . . . those found to have been issued as collateral security for pre-existing indebtedness. Section 138 of the state Constitution reads:

"No corporation shall issue stock or bonds except for money, labor done, money or property actually received; and all fictitious increase of stock or indebtedness shall be void. The stock and indebtedness of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained at a meeting to be held after sixty days' notice given in pursuance of law."

Section 4528 of the Compiled Laws of 1913, in similar language,

declares this constitutional policy. It is well settled in this jurisdiction that a pledge of the unissued stock of a corporation as collateral security for an existing indebtedness is prohibited by the constitutional and statutory provisions referred to. McAndrews v. Idawa Gold Min. Co. 54 N. D. 734, 51 A.L.R. 1123, 210 N. W. 514. The reason for the holding is that the pledge might be foreclosed with the result that little might be realized for the stock upon the sale (much less than its par value), leaving the corporation indebted in the original amount less the amount so realized.

Thus could the corporation indirectly, through a pledge, accomplish that which it is forbidden to do directly; namely, issue its stock for something less than an equivalent in money, labor or property actually received. Proper regard for the constitutional policy, therefore, requires a holding that stock issued as collateral security is invalid. See Lavell v. Bullock, 43 N. D. 135, 144, 174 N. W. 764. There can be no distinction in this respect between stock and bonds. They are treated in the same manner in the Constitution and the statutes and the same rule is plainly applicable to both. Bonds of the third class, therefore, are not valid and are not secured by the trust deed.

With regard to the specification that the court erred in not finding the bonds held by the Marshall Malaise Lumber Company, Margaret N. Farr, and Lloyd C. Quinn to have been delivered as collateral security for pre-existing indebtedness *and for value,* we think little need be said in addition to what has heretofore been said. The proof with regard to the claim of the Marshall Malaise Lumber Company is typical and may be used to illustrate the state of the record in this respect. The proof is in the shape of a stipulation which recites that prior to its acceptance of the bonds it (the lumber company) was the holder of certain notes given to it for material and supplies delivered to the coal company. Then, it is stipulated as follows: "And as security for the payment of such notes there was authorized to be delivered to the Marshall Malaise Lumber Company on or about March 24, 1921, according to the minutes of the board of directors of said Lucky Strike Coal Company, by the board of directors of such corporation, $10,000 in gold notes, to-wit," et cetera. It was further stipulated that the notes for which the gold notes were collateral had not been paid. The record is equally clear with regard to the issuing of all the

other third class bonds. These bonds, having been issued and delivered as collateral security, fall within the prohibition notwithstanding that the one so taking them may be a holder for value. The law does not permit valid corporate stock or bonds to be issued which rest upon the consideration of an unpaid indebtedness. A consideration, such as an extension of time, may be sufficient to support a simple contract or to constitute value and yet be insufficient to amount to labor done or money or property actually received within the constitutional requirement.

This case is clearly distinguishable from such a case as that of Re Waterloo Organ Co. 67 C. C. A. 327, 134 Fed. 345, where there was a pledge of the bonds as security for both past indebtedness and future advances accompanied by an agreement by the pledgee to account for the bonds as their par value; and First Sav. & T. Co. v. Waukesha Canning Co. 128 C. C. A. 305, 211 Fed. 927, where the creditors took the bonds as collateral but with an obligation to either return them or to account for them at 75 per cent of their face value, the constitution invalidating the bonds only in cases where the corporation should receive less than 75 per cent of the value in money, labor or property. And it is likewise clearly distinguishable from cases where the bonds are issued in payment of pre-existing indebtedness for money, labor or property actually received. Re Snyder, 29 Misc. 1, 59 N. Y. Supp. 993. For authorities sustaining our conclusions, see 2 Fletcher, Cyc. Corp. pp. 941–952; L.R.A.1916E, 570, note.

In support of the appeal of the holders of the various miners' liens, it is urged, principally, that the court erred in holding class 2 bonds to be secured on an equality with those of class 1. It is not argued that the miners' liens are superior to the lien of the trust deed. Since we are of the opinion that the judgment with respect to the class 2 bonds is right, for the reasons above stated, it is unnecessary to separately consider or discuss the question raised on this appeal.

It follows from what has been said that the judgment of the trial court is right, and it is affirmed.

CHRISTIANSON, NUESSLE, BURKE, and BURR, JJ., concur.